## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| X.AI LLC,<br><br>      Plaintiff,<br><br>   v.<br><br>KEITH ELLISON, in his official capacity, as<br>Attorney General of Minnesota,<br><br><br>      Defendant. | Case No. 0:26-cv-_____<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff X.AI LLC ("xAI") brings this civil action against Keith Ellison, in his official capacity as Minnesota Attorney General, for declaratory and injunctive relief and alleges as follows:

### INTRODUCTION

1.     This suit challenges House File 1606 ("HF 1606"), a Minnesota statute that imposes an overbroad, content-based ban on free speech and the tools of visual expression in a clumsy attempt to prohibit "nudification." xAI strictly prohibits its users from generating nude or sexualized images of people without their consent and has indeed filed suit against users who evade its extensive technological blockers to generate such images in violation of this strict prohibition. xAI accordingly does not contest Minnesota's interest in prohibiting the dissemination of artificially generated

nude images of real people without their consent. But the statute Minnesota enacted extends far beyond that goal, exposing a wide array of protected speech to civil liability and government sanctions.

2.      HF 1606 punishes AI platforms that allow users to alter images of real people to depict an "intimate part." But the statute contains no knowledge, intent, or purpose requirement. It is a strict-liability statute keyed solely to whether a user succeeded in creating a covered image using the AI provider's platform—regardless of whether the provider prohibits users from using its tool for such a purpose, regardless of how many mitigations the provider has in place, and regardless of how diligently the provider polices such conduct using its tool. There is no safe harbor for good-faith efforts of the provider of general-purpose AI creative tools to avoid harms. Liability attaches even if the depicted persons *consented*—or created the image *themselves*—and even if the image is never shared. Liability also attaches even if the image has artistic, scientific, political, satirical, educational, medical, or religious value, and (again) even if the company has deployed near-perfect, state-of-the-art technical controls to prevent the generation of nude images.

3.      Additionally, the law's definition of "intimate part" is exceptionally broad. Although the federal government and various states have enacted statutes that clearly define nudity for the specific context of AI-generated images, Minnesota rejected such a precise definition. Instead, it borrowed the definition of "intimate

2

part" from a criminal sexual-contact statute. That definition was drafted for nonconsensual touching and thus covers the inner thigh, buttocks, or breast of a man or woman, as well as the groin and primary genital area. HF 1606 accordingly bans ordinary depictions of men without shirts, people in shorts or swimsuits, and other body parts routinely displayed in public—far beyond what an ordinary person would consider "nudification."

4.    Despite these deficiencies, Minnesota seeks to impose massive civil penalties up to $500,000 each time a user manages to use a company's tool to generate or alter an image or video prohibited by this law. The law also establishes a private cause of action against the company providing the tool for any individual depicted in such an image.

5.    The First Amendment protects against laws that target speech because of what is communicated, as well as laws that favor one class of creators over another. Such laws are presumptively unconstitutional and must be overturned unless the government proves they are narrowly tailored to advance a compelling interest through the least restrictive means.

6.    HF 1606 flouts these foundational First Amendment principles. It is content-based and vastly overinclusive: it bans protected non-sexual, consensual, and non-disseminated speech that has no connection to any legitimate interest in preventing distribution of nonconsensual nude images. And narrower, less speech-

3

restrictive alternatives already exist. Minnesota law and the federal TAKE IT DOWN Act already prohibit and provide remedies for the knowing, nonconsensual dissemination of deepfakes depicting genitals, the pubic area, anus, or exposed nipples without sweeping in ordinary AI-assisted editing of everyday body parts.

7.      Confronted with $500,000-per-image strict liability and no safe harbor, xAI has no practical choice but to restrict Grok Imagine's image-editing features in various ways when the statute takes effect on August 1, 2026. Protected speech freely available before the law takes effect will thus be chilled.

8.      Because HF 1606 is an unconstitutional abridgment of the First Amendment rights of providers of general-purpose AI creative tools and the citizens who use them, it must be declared unconstitutional and its enforcement against xAI preliminarily and permanently enjoined.

## JURISDICTION & VENUE

9.      This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory and other appropriate relief under 28 U.S.C. §§ 2201(a) and 2202.

10.      Venue is proper in this District under 28 U.S.C. § 1391(b) because Attorney General Ellison is located, resides, and has offices in this judicial district

4

and in the State of Minnesota, and the events giving rise to this action occurred here. The Act was also enacted in this judicial district.

## PARTIES & STANDING

11.    xAI is a limited liability company organized under the laws of Nevada with its principal place of business in Austin, Texas. xAI maintains no offices in Minnesota.

12.    xAI is a leading frontier AI developer whose flagship product is a family of models known as Grok. In addition to a general-purpose large language model, Grok includes an image- and video-generation model called Grok Imagine. Grok Imagine can generate new images and short videos from ordinary written or spoken prompts, and it can edit or animate images supplied by users. Users rely on Grok Imagine for a wide variety of purposes, including to create product mockups and demonstrations, virtually try on clothes and accessories, and generate political satire. xAI makes Grok Imagine available to users nationwide, including many in Minnesota, through the Grok App, Grok.com, and an application programming interface.

13.    As described below, HF 1606 prohibits a "person who owns or controls a website, application, software, program, or other service" from allowing a user to "access, download, or use the website, application, software, program, or other service" to create images prohibited by the state or to create such images "on behalf

5

of a user." Minn. Stat. § 325E.91, subd. 2(a). HF 1606 imposes severe consequences for noncompliance. It authorizes the Attorney General to seek civil penalties up to $500,000 for each violation, as well as injunctive relief and other remedies. Minn. Stat. § 325E.91, subd. 5(a); *see also* Minn. Stat. § 8.31, subd. 3. The Act separately provides a private cause of action, which authorizes individuals depicted in violation of the law to seek treble damages, punitive damages, injunctive relief, and attorneys' fees. Minn. Stat. § 325E.91, subd. 4.

14.    These prohibitions implicate Grok Imagine. As explained below, the Act's sweeping definitions are broad enough to capture many constitutionally protected images and videos that users can produce with Grok Imagine. *See infra* ¶¶ 35–44. The law also imposes strict liability for any images and videos that users might manage to create in violation of Grok's terms of service, which is possible only by evading sophisticated, state-of-the-art controls that xAI employs. *See infra* ¶¶ 25–26, 33. xAI thus "owns or controls" the type of "website, application, software, program, or other service" contemplated by HF 1606. *See* Minn. Stat. § 325E.91, subd. 2(a). If the company continues to allow Minnesotans to edit photos using Grok Imagine it will be exposed to the Act's penalties.

15.    Further, xAI has an "actual and well-founded fear that the law will be enforced against" it if it does not comply. *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). "The State has not suggested that the newly enacted law

will not be enforced," and there is "no reason to assume otherwise." *Id.* xAI therefore plans to restrict Grok Imagine's image-editing feature in various ways before the Act takes effect on August 1, 2026. But for HF 1606 and its penalties, xAI would continue to offer the editing feature exactly as it does today.

16.     Defendant Keith Ellison is the Minnesota Attorney General, sued exclusively in his official capacity. As the State's chief law-enforcement officer, Attorney General Ellison is charged with enforcing Minnesota's laws, including HF 1606. In fact, HF 1606 expressly vests enforcement authority in the Minnesota Attorney General. *See* Minn. Stat. § 325E.91, subd. 5(a).

17.     Because Attorney General Ellison is statutorily directed to enforce HF 1606 and has not disclaimed any intent to do so, xAI has a credible fear that he will enforce the statute against the company. Attorney General Ellison is therefore a proper defendant against whom xAI may seek prospective relief to enjoin the implementation and enforcement of HF 1606. *See 281 Care Committee v. Arneson*, 638 F.3d 621, 631, 633 (8th Cir. 2011) (explaining that "[w]hen a statute is challenged as unconstitutional, the proper defendants are the officials whose role it is to administer and enforce the statute," and that even "'some connection' between the attorney general and the challenged statute" is enough to make the attorney general a proper defendant (quoting *Reprod. Health Servs. v. Nixon*, 428 F.3d 1139, 1145–46 (8th Cir.2005)).

## FACTUAL ALLEGATIONS

### A.   xAI Develops its Own General-Purpose Image Creation and Alteration AI Model.

18.   Beginning around March and April 2023, xAI started developing its own AI models. xAI's initial efforts focused exclusively on developing large language models, which generate text in response to questions supplied by users. In November 2023, xAI succeeded in a limited public release of its first-generation model, Grok-1. Several months later, around the time that xAI released its second-generation model, the company began developing a proprietary model capable of generating and altering images.

19.   On December 9, 2024, xAI announced that it was "updating Grok's capabilities with a new autoregressive image generation model, code-named Aurora."[1] As xAI explained, Aurora "excels at photorealistic rendering and precisely following text instructions," and "can render precise visual details of real-world entities, text, logos, and can create realistic portraits of humans."[2] The model also shipped with "native support for multimodal input, allowing it to take inspiration from or directly edit user-provided images."[3] In late July 2025, xAI began rolling

---

[1] xAI, *Grok Image Generation Release* (Dec. 9, 2024), https://x.ai/news/grok-image-generation-release.

[2] *Id.*

[3] *Id.*

out Grok Imagine, a dedicated image- and video-generation experience within Grok. The Grok Imagine product found an immediate audience. On August 5, 2025—roughly a week after the initial release—Elon Musk reported on X: "Grok Imagine usage is growing like wildfire. 14 million images generated yesterday, now over 20 million today!"[4]

20.    xAI has upgraded the product several times since the initial release. In October 2025, xAI announced Imagine v0.9, a new video generation model with improved visual quality, motion, audio generation, and more.[5] In February 2026, xAI announced Grok Imagine 1.0, which allowed users to generate "10-second videos, 720p resolution, and dramatically better audio."[6] In May 2026, xAI announced a "Quality Mode" providing "[h]igher realism," "[s]tronger text rendering," and "[b]etter creative control."[7] And just last month, xAI released Grok

---

[4] Elon Musk (@elonmusk), X (Aug. 5, 2025, 2:44 AM CT), https://x.com/elonmusk/status/1952636922477572324 (last visited July 27, 2026), [https://perma.cc/W3QD-W5HB].

[5] SpaceXAI (@SpaceXAI), X (Oct. 5, 2025, 5:03 PM CT), https://x.com/SpaceXAI/status/1975607901571199086 (last visited July 27, 2026), [https://perma.cc/96Q2-6YK7].

[6] SpaceXAI (@SpaceXAI), X (Feb. 1, 2026, 9:29 PM CT), https://x.com/xai/status/2018164753810764061 (last visited July 27, 2026), [https://perma.cc/8ZCJ-5FJE].

[7] xAI, *Grok Imagine Quality Mode API* (May 6, 2026), https://x.ai/news/grok-imagine-quality-mode (last visited July 27, 2026), [https://perma.cc/8LDW-QXKF].

Imagine Video 1.5, which is the company's "best image-to-video models yet: better motion, better physics, better audio, at the fastest speeds."[8]

21.    The images and videos that users create with Grok Imagine and share publicly span the full range of visual culture: illustrations and concept art, animated family photographs, memes, product mockups, political satire, and religious imagery. For example, a historian lecturing students about urban life in imperial Rome might use Imagine to generate a street-level reconstruction of the cramped, fire-prone apartment blocks where many Romans lived. Kindergarten teachers teaching a unit on dinosaurs can use Imagine to create a coloring page of a tyrannosaurus rex or triceratops for their students. And others might use Imagine to recreate a scene from memory, for instance, a grandparent's childhood home that has long since been destroyed.

22.    Users can also edit and animate existing images with Grok Imagine. This allows users to remove objects, change the scenery, or apply any art style. A boutique candle company might photograph its pumpkin-spice scented candle on a white background and then use Imagine to generate material for an autumn marketing campaign, for example, an image depicting the candle beside a rain-

---

[8] xAI, *Grok Imagine Video 1.5* (June 16, 2026), https://x.ai/news/grok-imagine-video-1-5 (last visited July 27, 2026), [https://perma.cc/BQQ2-V58Y]; *see also* xAI, *Grok Imagine 1.5 Preview* (June 3, 2026), https://x.ai/news/grok-imagine-1-5 (last visited July 27, 2026), [https://perma.cc/6P4A-6DXM].

streaked window with a knit blanket and a lit fireplace in the background. Real estate agents can use Imagine to stage empty rooms virtually rather than spend thousands of dollars to rent actual furniture to stage the home. And someone might use Imagine to restore a creased, water-stained, and torn photograph of a loved one.

23.    Grok Imagine is designed so that anyone can use it. Creating or editing an image requires no artistic training, no technical knowledge, and no specialized software: the user types or speaks a short description, and the result arrives in seconds. This is precisely why tools like Grok Imagine have produced an explosion of image-based speech—anyone can transform an idea into a picture using ordinary language.

24.    Grok Imagine is available in all 50 states and internationally through a standalone smartphone application and a web interface. Users may access Grok Imagine free of charge, and xAI's higher, paid tiers offer more advanced features and higher usage limits. Grok Imagine is also available to developers and businesses through an application programming interface, which allows them to build Imagine's capabilities into their own products and workflows.

25.    Both consumers and businesses must agree to xAI's terms of service before using Grok Imagine. The terms of service prohibit using Imagine to engage in "any illegal, harmful, or abusive activities, or any other behavior that violates our

11

Acceptable Use Policy."[9] Anyone who violates the terms of service or acceptable use policy is barred from using xAI's services, and xAI reserves the right to suspend or terminate access to "prevent abuse, comply with the law, or address security issues."[10] Relevant here, xAI's acceptable use policy prohibits using the service in ways that violate "a person's privacy or their right to publicity," including by "[u]ndressing or nudifying real persons, or otherwise altering a real person's image or likeness to depict them in an intimate or sexual context," "[d]epicting likenesses of persons in a pornographic manner," and "[s]exualizing or exploiting children."[11] The policy further prohibits "[s]tripping, altering or circumventing embedded provenance metadata or watermarks" and circumventing xAI's "protective measures and safety mitigations."[12]

26.    xAI takes violations of its terms of service seriously. The company enforces its rules against violators through account suspensions, account terminations, and by reporting suspected child sexual abuse material to the National

---

[9] xAI, *Terms of Service – Consumer* (effective June 26, 2026), https://x.ai/legal/terms-of-service (last visited July 27, 2026), [https://perma.cc/Q4TZ-YXR2].

[10] *Id.*

[11] xAI, *Acceptable Use Policy* (effective June 26, 2026), https://x.ai/legal/acceptable-use-policy (last visited July 27, 2026), [https://perma.cc/6CXJ-DMR9].

[12] *Id.*

Center for Missing & Exploited Children. In 2026 alone, xAI has suspended over 50,000 accounts and made over 70,000 reports to NCMEC, which have resulted in (at least) 244 arrests.[13] xAI has gone as far as suing one user for breach of contract because that individual surreptitiously evaded the technological controls in place to prevent the creation of child sexual abuse material.[14] Indeed, Elon Musk—echoing the terms of service described above—has made it clear that "[a]nyone using Grok to make illegal content will suffer the same consequences as if they upload illegal content."[15]

**B.** **HF 1606 Prohibits AI Platforms from Allowing Users to Create Prohibited Images and Imposes Ruinous Penalties on Platforms that Fail to Prevent Such Uses.**

27.     HF 1606 prohibits a "person who owns or controls a website, application, software, program, or other service" from allowing "a user to access, download, or use the website, application, software, program, or other service to nudify an image or video." Minn. Stat. § 325E.91, subd. 2(a). The Act similarly prohibits "nudify[ing] an image or video on behalf of a user." Minn. Stat. § 325E.91,

---

[13] Complaint, *X.AI LLC v. Harwood*, No. 7:26-cv-00078-O (N.D. Tex. filed July 14, 2026), ECF No. 1, ¶ 3.

[14] *See id.*

[15] Elon Musk (@elonmusk), X (Jan. 3, 2026, 3:34 AM CT), https://x.com/elonmusk/status/2007475612949102943 (last visited July 27, 2026) [https://perma.cc/YXV3-S5HP].

subd. 2(a)(2). And it also bans "advertis[ing] or promot[ing]" any such "website, application, software, program, or other service." Minn. Stat. § 325E.91, subd. 2(b).

28.    The Act defines "nudify" as "the process by which: (1) an image or video is altered or generated to depict an intimate part not depicted in an original unaltered image or video of an identifiable individual; and (2) the altered or generated image or video is so realistic that a reasonable person would believe that the intimate part belongs to the identifiable individual." Minn. Stat. § 325E.91, subd. 1(d). This definition turns on two terms: "intimate part" and "identifiable individual."

29.    "Intimate part" is not defined directly in the statute. *See* Minn. Stat. § 325E.91, subd. 1(c) (stating that "'Intimate part' has the meaning given in section 609.341, subdivision 5). The Act instead borrows a definition from Minnesota's sexual conduct laws, which define "intimate parts" as including "the primary genital area, groin, inner thigh, buttocks, or breast of a human being," Minn. Stat. § 609.341, subd. 5. In the context of those laws, the term delineates when nonconsensual touching constitutes criminal sexual contact. *See* Minn. Stat. § 609.341, subd. 11 (defining "Sexual contact" to include "the intentional touching by the actor of the complainant's intimate parts"). The definition is not exclusive: it "includes" the enumerated body areas. Minn. Stat. § 609.341, subd. 5. A definition focused on certain areas of the body makes sense for a statute focused on nonconsensual sexual

14

contact. Touching someone's inner thigh, breast, or buttocks without consent often will be objectionable. But the definition is far too broad for a statute focused on image and video generation. People routinely wear shorts in public that expose some or all of their inner thighs; men may go shirtless in public, exposing their breasts; a woman's swimsuit may expose some or all of her inner thigh; men and women wear speedo, bikinis, or other types of swimsuits of apparel that expose their breasts and buttocks, at least in part. By using a definition of "intimate part" that includes any image or video that depicts the "inner thigh, buttocks, or breast"—or even a portion thereof—the Act covers all these examples, even if the depicted individual routinely wears the very type of clothing in public that the artificially generated image or video shows. And because the definition is drawn from a statute that criminalizes *touching*, transporting it without that context into an image generation statute means that the altered or generated image or video need not be sexual, or even suggestive.

30.    The Minnesota legislature deliberately adopted a broad definition of nudification. The original draft of HF 1606 cross-referenced a targeted prohibition on deep fakes keyed to exposure of "the genitals, pubic area, partially or fully exposed nipple, or anus of an individual." *See* HF 1606, 94th Leg., § 1, subd. 1(b) (Minn. 2025) (as introduced Feb. 26, 2025) (cross-referencing Minn. Stat. 604.32, subd. 1(d)). This more precise definition lists discrete anatomical features rather than general regions of the body and, as a result, supplies a narrower and better-defined

15

trigger for which images are covered. Despite considering both definitions, the legislature ultimately rejected the tailored anatomical focus, opting instead for the more sweeping definition included in the final version.

31.     HF 1606's other key statutory term is "identifiable individual." The Act defines that term as "a person that is identifiable: (1) from the image itself, by the person depicted in the image, or by another person; or (2) from personal information displayed in connection with the image." Minn. Stat. § 325E.91, subd. 1(b). A person is "identifiable," in other words, if anyone—the subject, "another person," or a viewer of accompanying "personal information"—can identify him. The only textual limit on these definitions is the law's realism requirement: the altered or generated image must be "so realistic that a reasonable person would believe that the intimate part belongs to the identifiable individual." Minn. Stat. § 325E.91, subd. 1(d)(2).

32.     Equally significant is what HF 1606 does *not* say. The word "consent" appears nowhere in the statute. Liability does not depend on whether the person depicted objected to the image, welcomed it, or even made it personally. A service used by an adult to edit a photograph of him or herself or a consenting individual is covered on the same terms as a service used to create an image of an unwilling stranger. The statute's text draws no distinction among them. And this was by design. When a staff member of the Senate Judiciary and Public Safety Committee

16

pointed out that the Act's "prohibition applies to consensual images," Senator Maye Quade (the bill's principal sponsor) explained "that is intentional."[16]

33.    Nor does HF 1606 contain any scienter requirement of any kind. It creates a strict liability regime. A company's liability turns on the user's conduct—whether a user employed the service to "nudify" an image—not on anything the owner of the service knew, intended, or could have anticipated. And the statute provides no defense or safe harbor for a service whose terms of use prohibit "nudification" or whose technical controls are designed to block it—even if the service's prohibition is strict, clear, and aggressively enforced and even if those controls are state-of-the-art and function to near-perfection. Penalties attach to "each unlawful access, download, or use" by a user, Minn. Stat. § 325E.91, subd. 5(a), no matter what measures the owner has deployed to prohibit and prevent that use and no matter what efforts a user makes to circumvent them. Again, legislators recognized this problem during debate. Senator Kreun asked during a hearing whether anything in the bill "would protect a company" using their "best efforts to

---

[16] Minn. S., Hearing on HF 1606 Before the S. Judiciary & Pub. Safety Comm., 94th Minn. Leg., Reg. Sess. (Feb. 19, 2026), https://www.youtube.com/watch?v=Xo7JgKg8Rgk (Statement of Senator Maye Quade at 0:21:38 – 0:23:10) [https://perma.cc/X646-WRJ2].

prevent" users from generating prohibited images.[17] Rather than answer that question, Senator Maye Quade deflected.[18]

34.    In short, nothing in the statute conditions liability on the consent of the person depicted, on the service owner's knowledge or intent, on the safeguards the owner deploys, or on the potential misconduct of a user. It asks nothing about who requested the alteration, whose image was altered, or why. Instead, it makes service owners strictly liable every time a user succeeds in making an image the statute defines as "nudification."

35.    HF 1606's broad definition of "nudification" would capture a wide range of pedestrian images created with AI image generation tools. For instance:

---

[17] Minn. S., Hearing on HF 1606 Before the S. Judiciary & Pub. Safety Comm., (Feb. 19, 2026), https://www.youtube.com/watch?v=Xo7JgKg8Rgk (Statement of Senator Kreun at 0:45:53 – 0:46:20) [https://perma.cc/X646-WRJ2].

[18] *Id.* (Statement of Senator Maye Quade at 0:46:35 – 0:47:52).





36.    In this viral snapshot—which President Trump posted publicly—President Trump, Vice President J.D. Vance, Secretary of State Marco Rubio, and Secretary of the Interior Doug Burgum all are portrayed shirtless in the Washington Mall's reflecting pool, along with an unknown (possibly fictitious) woman.[19] An "intimate part" (the breast) of at least the President, Vice President, Secretary of the Interior, and the woman are "depict[ed]," with the Secretary of State also at least arguably included as well. The President posted this image on his personal account, presumably to make light of the public controversy surrounding repairs to the reflecting pool on the National Mall.

---

[19] Truth Social (@realDonald Trump) (May 1, 2026, 10:03 PM CT) https://truthsocial.com/@realDonaldTrump/posts/116502756484361615 (last visited July 27, 2026).

37.     Next, in an attempt at political humor, a user created the following image depicting a former and current governor from opposite sides of the political spectrum engaged in a sumo wrestling match.[20] xAI could be held liable for this image because both individuals are "nudified" by "depict[ing]" their "intimate parts," here their breasts and inner thighs:



38.     Finally, showing just how little it takes for an image to be captured by HF 1606, President Trump is arguably "nudified" by "depict[ing]" his inner thigh as he hangs out with Chinese President Xi, Elon Musk, and Tim Cook on a Chinese

---

[20] Sara TFTB1 (@SaraTftb1), X (July 13, 2026, 10:06 PM CT), https://x.com/SaraTftb1/status/2076865814817370575?s=20 (last visited July 27, 2026) [https://perma.cc/ZZM6-F69L].

street—an image presumably generated as a satirical take on President Trump's

recent visit to China with Musk and Cook:[21]



6:50 AM · May 14, 2026 · **22.9K** Views

39.     The examples are endless. Anyone with a computer and an internet

connection can make humorous, scientific, artistic, satirical, or innocuous images

that Minnesota's HF 1606 bans as "nudification."

40.     The limited exemption that is written into the law does little to narrow

the Act's broad reach. HF 1606's prohibitions "do not apply when the website,

application, software, program, or other service requires the technical skill of a user

to nudify an image or video." Minn. Stat. § 325E.91, subd. 3. "Technical skill," in

---

[21] Coin Bureau (@coinbureau), X (May 14, 2026, 11:50 AM CT), https://x.com/coinbureau/status/2054891977938800952 (last visited July 27, 2026) [https://perma.cc/4LXF-MECE].

turn, "means substantial application of individualized technological or artistic skill and judgment by a human creator in directing, shaping, or controlling the output." Minn. Stat. § 325E.91, subd. 1(e).

41.     The penalties for violating HF 1606's prohibitions are severe. The Act authorizes the Minnesota Attorney General to seek civil penalties of up to $500,000 for each individual use of a covered service. Minn. Stat. § 325E.91, subd. 5(a). Specifically, subdivision 5(a) provides that "[t]he attorney general may enforce this section under section 8.31"—the statute that directs the Attorney General to investigate and seek civil penalties and injunctive relief for unlawful practices in business, commerce, or trade. The law explains that "a person who violates this section is subject to a civil penalty not to exceed $500,000 for *each* unlawful access, download, or use under subdivision 2." Minn. Stat. § 325E.91, subd. 5(a) (emphasis added).

42.     In other words, the penalty is keyed to every image generated. A company whose users request just ten images in violation of the statute would face exposure up to $5 million in civil penalties alone. A company with a thousand violative images could be fined up to $500 million. And a business whose users created a hundred thousand images covered by HF 1606 (not at all unlikely for a publicly available program with millions of users generating billions of images) could owe an eye-popping $50 billion dollars.

22

43.     And that is not all. HF 1606 further authorizes private suits with treble damages, punitive damages, and attorney fees. Minn. Stat. § 325E.91, subd. 4. These provisions state that "[a]n individual depicted in an image or video that was nudified in violation of this section may bring a civil action in district court against the person who violated this section for":

- "compensatory damages, including mental anguish or suffering, in an amount up to three times the actual damages sustained;" *id.* subd. 4(1);

- "punitive damages;" *id.* subd. 4(2);

- "injunctive relief;" *id.* subd. 4(3);

- "reasonable attorney fees, costs, and disbursements;" *id.* subd. 4(4); and

- "other relief the court deems just and equitable." *id.* subd. 4(5).

44.     The statute applies to any person "who owns or controls a website, application, software, program, or other service." Minn. Stat. § 325E.91, subd. 2(a). Such a person "must not: (1) allow a user to access, download, or use the website, application, software, program, or other service to nudify an image or video; or (2) nudify an image or video on behalf of a user." *Id.* Both prongs regulate the person who "owns or controls" the tool, not the person who uses it. Under the first prong, the owner's violation consists of "*allow*[*ing*] a user" (emphasis added) to employ the service to nudify an image—that is, liability attaches to the owner based on the conduct of a third party. § 325E.91, subd. 2(a)(1). Nothing in subdivision 2 imposes

23

any prohibition on the user who nudifies an image, or on any person who distributes one.

### C.    In Response to HF 1606, xAI Will Withhold Grok Imagine's Image-Editing Feature from Minnesotans.

45.    HF 1606 takes effect on August 1, 2026. As explained, every photograph edited by every Minnesota user that falls within the statutory definition could lead to a separate $500,000 penalty. Confronted with that crushing exposure, xAI plans to alter Grok Imagine's image-editing feature in various ways. But for HF 1606 and its penalties, xAI would have no need to make these changes.

46.    Satirical images restored or animated family photographs, and creative projects that Minnesota users could have made by editing images with Grok Imagine will be affected—not because xAI's policies permit misuse (they forbid it), but because HF 1606 leaves xAI no choice.

**COUNT I**
**Declaratory Relief and Preliminary and Permanent Injunctive Relief for**
**Violations of the**
**First Amendment to the United States Constitution**
**(42 U.S.C. § 1983, 28 U.S.C. § 2201(a))**
**(Impermissible Burdens on Speech and Content-Based Discrimination)**

47.    xAI re-alleges and incorporates by reference all allegations set forth above.

48.    The First Amendment provides that "Congress shall make no law . . . abridging the Freedom of Speech, or of the Press." U.S. Const. amend. I. These

24

protections apply to the states through the Fourteenth Amendment's Due Process Clause.

49.    HF 1606 violates the First Amendment. The Act restricts protected speech (*i.e.*, the creation of images and videos) and thereby burdens the expressive rights of xAI and of people who use Grok Imagine. And the Act turns on what an image or video depicts. These content-based burdens trigger strict scrutiny, which is "fatal in fact absent truly extraordinary circumstances." *Free Speech Coal. v. Paxton*, 606 U.S. 461, 485 (2025). Minnesota cannot satisfy strict scrutiny here. HF 1606 thus is unconstitutional, and its enforcement against xAI should be preliminarily and permanently enjoined.

50.    **HF 1606 restricts protected First Amendment speech**. Grok Imagine enables Minnesotans to envision and create images and videos on topics as diverse as human thought—including news and political material, religious material, scientific material, educational content, and more. It takes users' ideas and creativity, expressed as words on a screen, and allows them to convert those ideas into new forms that visualize, create, and communicate their vision. This is all speech that qualifies for First Amendment protection. xAI is likewise engaged in protected First Amendment activity insofar as it develops and provides the speech-promoting, tool of expression that makes it possible for individuals to create this vast array of speech.

25

HF 1606 impermissibly burdens these rights by putting a broad—indeed, overbroad—category of AI-generated images and videos off limits.

51.     The images and videos that Minnesotans create with Grok Imagine are protected First Amendment speech. Although the "Free Speech Clause exists principally to protect discourse on public matters," the Supreme Court has "long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011). As a result, "[a]ll manner of speech—from 'pictures, films, paintings, drawings, and engravings,' to 'oral utterance and the printed word'—qualify for the First Amendment's protections." *303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023) (quoting *Kaplan v. California*, 413 U.S. 115, 119–20 (1973)). This necessarily includes the images and videos that HF 1606 attempts to regulate. Just like traditional mediums of expression, those images and videos "communicate ideas—even social messages—through many familiar literary devices . . . and through features distinctive to the medium," and that "suffices to confer First Amendment protection." *Brown*, 564 U.S. at 790.

52.     Creating images and videos using Grok Imagine is likewise protected First Amendment activity. As the Supreme Court explained, "[w]hether government regulation applies to creating, distributing, or consuming speech makes no difference." *Brown*, 564 U.S. at 792 n.1; *see also Sorrell v. IMS Health Inc.*, 564

26

U.S. 552, 570 (2011) (explaining that the "creation and dissemination of information are speech within the meaning of the First Amendment"). Thus, the process of creating images and videos with Grok Imagine is itself entitled to full First Amendment protection.

53.     It makes no difference that the means for creating these images is an AI system. The "'basic principles of freedom of speech and the press . . . do not vary' when a new and different medium for communication appears." *Brown*, 564 U.S. at 790 (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)); *see also Interactive Digital Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954, 957 (8th Cir. 2003) (explaining that the "mere fact" that "pictures, graphic design, concept art," and more "appear in a novel medium is of no legal consequence"). Expression is "no less protected speech today" because it is created with new instruments rather than "pen and paper." *303 Creative*, 600 U.S. at 587.

54.     The First Amendment also protects xAI insofar as it is developing and providing users with a tool that facilitates their creation of speech. States cannot target the tools of expression—whether a pen and paper, a word processing or image editing software platform, or a user-directed AI tool that outputs expressive content—because that restrains or burdens the underlying expression itself. *See, e.g.*, *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582 (1983) (tax on the cost of paper and ink products used by a publication "burdens

27

rights protected by the First Amendment"); *cf. Buckley v. Valeo*, 424 U.S. 1, 19 (1976) ("A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached").

55.    HF 1606 burdens both xAI's and its users' right to free expression under the First Amendment. The Act prohibits a "person who owns or controls a website, application, software, program, or other service" from allowing users "to access, download, or use the website, application, software, program, or other service to nudify an image or video." Minn. Stat. § 325E.91, subd. 2(a)(1). And, importantly, HF 1606 defines prohibited images in a way that sweeps in a wide range of fully protected speech. HF 1606 thus restricts xAI's ability to offer Grok Imagine to users (at least without altering its image editing capabilities) and thereby deprives Minnesotans of an important tool for expression. This type of direct—and substantial—burden triggers First Amendment scrutiny.

56.    **HF 1606 imposes a content-based restriction on speech and is therefore subject to strict scrutiny**. It is the "most basic" principle of the First Amendment that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790–91 (citation modified). "Content-based laws—those that target speech based on its

28

communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The Supreme Court has applied these principles to speech of many different forms, from outdoor signs to violent video games to depictions of animal cruelty to sexually suggestive content on television and the internet—just to name a few examples from recent years. *See Reed*, 576 U.S. at 159; *Brown*, 564 U.S. at 799; *United States v. Stevens*, 559 U.S. 460, 468–69 (2010); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813–14 (2000); *Reno v. ACLU*, 521 U.S. 844, 874 (1997). In short, the First Amendment generally "bars the government from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002).

57.    HF 1606 explicitly regulates expression based on content. By its plain terms, the Act applies only to a website, application, software, program, or other service that is capable of altering an image "to depict an intimate part not depicted" in the original. Minn. Stat. § 325E.91, subd. 1(d)(1). And providers violate HF 1606 each time that a user downloads, accesses, or uses the service "to nudify an image or video." Minn. Stat. § 325E.91, subd. 2(a)(1). The law says nothing about using AI-powered image generation tools to alter an image by swapping out the background for a dramatic landscape, softening the lighting, or changing someone's hairstyle. But if the exact same tool is used to change an individual's attire in a way

29

that partially reveals the inner thigh or breast, then the Attorney General can seek a $500,000 civil penalty. Put another way, HF 1606 can only be enforced by reference to the content of the images that users create—a hallmark of content-based laws. *See McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (law "would be content based if it required 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred" (quoting *F.C.C. v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)). HF 1606 thus "singles out specific subject matter for differential treatment." *Reed*, 576 U.S. at 169. "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (plurality opinion).

58.     In short, HF 1606 is subject to strict scrutiny because the law restricts fully protected expression based on its content.

59.     **HF 1606 cannot survive strict scrutiny**. Because strict scrutiny applies, Minnesota bears the heavy burden of demonstrating that HF 1606 is narrowly tailored to promote a compelling governmental interest and that there are no less restrictive alternatives. *Playboy*, 529 U.S. at 813. It cannot. xAI does not dispute that Minnesota has a compelling interest in curbing the nonconsensual dissemination of artificially generated nude images, HF 1606 is not narrowly tailored to that interest. The law is overinclusive and there are far less restrictive alternatives that function to achieve the same ends.

60.    HF 1606 is "vastly overinclusive" by design, restricting far more speech than necessary to accomplish its purported aim. *Brown*, 564 U.S. at 804. Because HF 1606 defines "nudify" in a way that sweepingly forbids a wide range of images that do not even contain nudity, as that term is commonly understood, it burdens substantial amounts of speech that do not relate to any interest the state can assert. Again, the statute defines "nudify" to mean altering an image or video "to depict an intimate part not depicted" in the original image, where "intimate part" includes the "inner thigh, buttocks, or breast of a human being." Minn. Stat. § 325E.91, subd. 1(d)(1); Minn. Stat. § 609.341, subd. 5. This would include for example, benign images depicting individuals in shorts (inner thigh), men without shirts (breast), and competitive swimmers in speedos (buttocks and breast). The Act is therefore overinclusive because it penalizes companies for providing a service that allows users to create images and videos that do not even arguably contain any nudity. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975) (ordinance forbidding films containing "any uncovered buttocks or breasts" was overinclusive because it reached beyond protecting minors against sexual content to "bar a film containing a pictures of a baby's buttocks, the nude body of a war victim, or scenes from a culture in which nudity is indigenous").

61.    Moreover, HF 1606 allows no exception for altered images and videos with medical, scientific, educational, journalistic, artistic, political, or religious

31

value—all of which are unequivocally protected speech. It applies equally to a citizen creating a strongman parody of a male politician posed shirtless (protected), and a student creating deepfake pornography depicting a classmate (not protected). Minnesota may have a compelling interest in curbing the latter, but it cannot assert any plausible interest in preventing the former.

62.     The Act also applies regardless of whether the individuals depicted in the image consented to the alterations—or indeed performed the alterations on their own. HF 1606's principal sponsor stated that this was an "intentional" drafting decision, explaining there is no way to distinguish between images that are nudified with and without consent.[22]  But any interest that Minnesota has in preventing *nonconsensual* "nudification" cannot sustain a prohibition on *consensual* "nudification." As the Supreme Court explained in *Ashcroft v. Free Speech Coalition*, the government "may not suppress lawful speech as the means to suppress unlawful speech" and "[p]rotected speech does not become unprotected merely because it resembles the latter." 535 U.S. at 255.

63.     HF 1606 is also overinclusive because it creates a strict-liability regime. A provider violates the statute if it (unwittingly) "allow[s] a user to access,

---

[22] Minn. S., Hearing on HF 1606 Before the S. Judiciary & Pub. Safety Comm., 94th Minn. Leg., Reg. Sess. (Feb. 19, 2026), https://www.youtube.com/watch?v=Xo7JgKg8Rgk (Statement of Senator Maye Quade at 0:23:10) [https://perma.cc/X646-WRJ2].

download, or use" its service "to nudify an image or video." Minn. Stat. § 325E.91, subd. 2. Liability turns on whether a user is successful in altering an image or video in a proscribed way. It does not matter if the provider deploys robust, state-of-the-art controls to prevent users from using its service to create prohibited images or videos. Because HF 1606's prohibition is backed by a $500,000-per-image civil penalty, providers may well have no choice but to alter their services in Minnesota rather than run the risk that users will evade their controls. And that would hamper all uses of AI image-generation tools, including those that HF 1606 does not purport to regulate. This chilling effect is why the First Amendment requires states to impose a "subjective mental-state requirement" before restricting even the least protected categories of expression—including obscenity, incitement, and true threats. *Counterman v. Colorado*, 600 U.S. 66, 75 (2023). Or as the Eighth Circuit explained, "any statute that chills the exercise of First Amendment rights must contain a knowledge element." *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992). So too here.

64.     And insofar as the State's supporting interest is preventing the psychological harm that results when prohibited images are shared, HF 1606 is overinclusive because there is no dissemination requirement. Liability is keyed to creation: Providers violate the act if they "allow a user to access, download, or use" their service to generate prohibited images or videos. Minn. Stat. § 325E.91, subd.

33

2(a)(1). In other words, an image generated once, seen only by the user who made it, and immediately deleted incurs the same $500,000 penalty as an image broadcast to the world. Because liability does not turn on distribution, Minnesota cannot invoke any purported distribution-related harms to sustain HF 1606. *See Ashcroft v. Free Speech Coalition*, 535 U.S. at 253 (state "may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite future time'" (quoting *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (per curiam)).

65.    The availability of less restrictive alternatives further dooms HF 1606. "If a less restrictive alternative would serve the [g]overnment's purpose, the legislature must use that alternative." *Playboy*, 529 U.S. at 813. "[T]he burden is on the [g]overnment to prove that the proposed alternatives will not be as effective as the challenged statute." *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004). And, importantly, the inquiry "does not begin with the status quo of existing regulations, then ask whether the challenged restriction has some additional ability to achieve" the end, because "[a]ny restriction on speech could be justified under that analysis." *Id.* at 666.

66.    Here, existing state and federal laws prove that Minnesota's interest in preventing the nonconsensual dissemination of nude deep fakes can be achieved in a less speech restrictive way. It is already a crime in Minnesota to "intentionally disseminate a deep fake" when "the actor knows or reasonably should know that the

depicted individual did not consent to the dissemination" and the deep fake depicts "artificially generated intimate parts presented as the intimate parts of the depicted individual." Minn. Stat. § 617.262, subd. 2. And there is a parallel private right of action that allows victims to recover damages, injunctive relief, and a civil penalty up to $100,000. Minn. Stat. § 604.32, subd. 3. The federal TAKE IT DOWN Act creates a national analog that makes it a crime to "knowingly publish a digital forgery of an identifiable individual," where "digital forgery" means an "intimate visual depiction" of the individual. 47 U.S.C. § 223(h)(1)(B), (E), (3)(A). It also requires platforms to establish a notice and removal process that allows victims to request that intimate visuals depictions be removed. *See* 47 U.S.C. § 223a.

67.     These statutes are far less restrictive than HF 1606. Minnesota's deep fake laws define "intimate parts" more narrowly to mean "the genitals, pubic area, anus, or partially or fully exposed nipple of an individual." Minn. Stat. § 617.262, subd. 1(f); *see also* Minn. Stat. 604.32, subd. 1(d) (similar). The TAKE IT DOWN Act adopts a similar narrow coverage definition of "the uncovered genitals, pubic area, anus, or post-pubescent female nipple of an identifiable individual." 15 U.S.C. § 6851(a)(5); *see also* 47 U.S.C. § 223 (defining "intimate visual depiction" for purposes of the TAKE IT DOWN Act by reference to "section 6851 of Title 15"). Moreover, unlike HF 1606, these statutes require a plaintiff to prove dissemination, nonconsent, and scienter. *See* Minn. Stat. § 617.262, subd. 2; Minn. Stat. § 604.32,

35

subd. 2; 47 U.S.C. § 223(h)(3)(A). And, finally, the TAKE IT DOWN Act has numerous speech-protective exceptions. *See, e.g.*, 47 U.S.C. § 223(h)(3)(A)(iii) (excluding images depicting "a matter of public concern"); *id.* § 223(h)(3)(C)(ii)(III) (exempting images disclosed "reasonably and in good faith . . . as part of medical education, diagnosis, or treatment or for a legitimate medical, scientific, or education purpose").

68.     "[R]egulating speech must be a last—not first—resort." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002). And Minnesota cannot show why these "available, effective alternatives" would fail. *Ashcroft v. ACLU*, 542 U.S. at 666.

69.     Because HF 1606 reaches far more speech than is necessary to advance any interest in preventing the nonconsensual dissemination of nude deep fakes and is not the least restrictive means, it cannot survive any level of First Amendment scrutiny. The statute is thus unconstitutional at least as applied to Grok.

70.     **HF 1606 is facially unconstitutional because of its overbreadth.** The statute is also facially unconstitutional. In a typical facial challenge, the plaintiff must prove that no set of circumstances exist under which the law would be valid or that the law lacks a plainly legitimate sweep. *See Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021). But in the context of a First Amendment challenge, even a person whose First Amendment rights are not directly implicated

36

may challenge a statute that is so broadly written that it sweeps in protected speech and could therefore have a "deterrent effect on free expression." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984). The overbreadth doctrine allows facial invalidation of laws that "punish[] a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep . . . .'" *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).

71.     As described above, HF 1606 is wildly overbroad because it prohibits an immense amount of protected expressive conduct. Although Minnesota likely has a compelling interest in preventing individuals from creating nudes of other people without consent and distributing that content, the statute punishes AI platforms for assisting in the creation of a substantial amount of protected speech in relation to that limited goal. For example, the statute would punish AI platforms for allowing users to create images that are political, humorous, satirical, religious, or medical in nature. And even where genuine nudification is involved, the statute punishes AI platforms for allowing users to create actual nudes with the subject's consent—or even to create nudes of themselves. The state has no compelling interest in banning such consensual and non-injurious expressive conduct. The statute thus sweeps far too broadly to withstand First Amendment scrutiny.

72.    HF 1606 should accordingly be declared facially unconstitutional, and the Attorney General should be preliminarily and permanently enjoined from enforcing it against xAI.

## PRAYER FOR RELIEF

For the foregoing reasons, xAI respectfully requests that the Court:

A.    Enter a judgment declaring, pursuant to 28 U.S.C. §§ 2201(a) and 2202, that HF 1606 violates the First Amendment of the U.S. Constitution, both facially and as applied to xAI;

B.    Issue an order preliminarily and permanently enjoining Attorney General Ellison, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing the provisions of HF 1606. At minimum, the Attorney General and his agents should be preliminarily and permanently enjoined from enforcing the provisions of HF 1606 against xAI.

C.    Award xAI all costs and attorney's fees to which it is entitled pursuant to 42 U.S.C. § 1988 and other applicable law; and

D.    Grant xAI such other and further relief as the Court deems just and proper.

Dated: July 27, 2026                    Respectfully submitted,

                                        */s/ Todd A. Noteboom*
                                        Todd A. Noteboom (#0240047)
                                        Andrew P. Leiendecker (#0399107)
                                        Sarah R. Almquist (#0403469)
                                        STINSON LLP
                                        50 South Sixth Street, Suite 2600
                                        Minneapolis, MN 55402
                                        (612) 335-1500
                                        todd.noteboom@stinson.com
                                        andrew.leiendecker@stinson.com
                                        sarah.almquist@stinson.com

                                        Robert E. Dunn (*pro hac vice
                                        forthcoming*)
                                        EIMER STAHL LLP
                                        1999 S. Bascom Ave., Suite 1025
                                        Campbell, CA 95008
                                        Phone: 408.889.1690
                                        RDunn@eimerstahl.com

                                        *Attorneys for Plaintiff X.AI LLC*