UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

X.AI LLC,

Plaintiff,

vs.

Keith Ellison, in his official
capacity as Attorney General
of Minnesota,

Defendant.

Civil File No. 26-cv-03425 (DWF/DTS)

**MEMORANDUM OF LAW
IN OPPOSITION TO X.AI'S MOTION
FOR A PRELIMINARY INJUNCTION**

## INTRODUCTION

The Minnesota legislature nearly unanimously passed Minnesota's Nudification Ban, which bans AI-generated sexual images and other intimate parts—including the staggering amount child sexual abuse material that AI products like Grok Imagine generate. X.AI filed this lawsuit against the Minnesota Attorney General to block the law. But State legislatures are not powerless to stop the tools that allow these terrible images to proliferate.

X.AI's motion for a preliminary injunction to block Minnesota's law should be denied. First, X.AI has not demonstrated irreparable harm, which dooms its motion. The company waited until the last minute to sue, which undermines its irreparable harm argument. Apart from the delay, X.AI has alleged only financial harm, which is not irreparable; and any financial harm is minimal and unsubstantiated. Second, the balance of harms and the public interest cut decisively in favor of Minnesota's Nudification Ban. X.AI concedes that Minnesota has a compelling interest in blocking AI-generated sexual imagery. And the state is always harmed—and the public interest undermined—when it is

enjoined from enforcing statutes adopted by its democratically-elected and democratically-accountable representatives. Finally, X.AI is unlikely to succeed on the merits. X.AI has brought a pre-enforcement facial challenge to Minnesota's law, "and that decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). X.AI effectively concedes that Minnesota's law has substantial constitutional applications. And it does not come close to meeting its burden of showing that any unconstitutional applications outweigh the constitutional ones.

The motion for a preliminary injunction should be denied.

## STATEMENT OF FACTS

### I.   LEGISLATIVE HISTORY

House File 1606 was heard in the House Commerce Finance and Policy Committee on February 19, 2026.[1] Chief Author Representative Jessica Hanson described the importance of the bill before testimony began. She noted,

> The misuse of this technology has harmed too many people. It's empowered and enabled pedophiles and sexual predators to increasingly profit while causing more and more harm around the globe, particularly to children. These apps are readily available in nearly every app store, and we should not leave a dangerous tool like this to be [] available to be weaponized by more and more predators, nor should we leave this accessible to kids. We are already arriving too late to this work, folks, so we can't really afford to wait any longer.[2]

---

[1]   Materials from that hearing can be found at https://www.house.mn.gov/committees/minutes/94004/101444 (last accessed Aug. 14, 2026).

[2] Minn. H., Hearing on H.F. 1606 before the H. Commerce Finance & Policy Comm., 94th Leg., Reg. Sess. (Feb. 19, 2026) (1:31:26-1:32:02), *available at* lrl.mn.gov/audio/house/2026/com021926.mp3 (last accessed Aug. 14, 2026) (hereinafter "2/19/26 Hr'g"). Rep. Hanson's comments begin at 01:27:29.

Three people who have been directly impacted by this technology testified. The same perpetrator nudified images of the three women, and dozens more. The perpetrator was someone they knew and trusted. One victim who testified was Molly Kelly.[3] The man who targeted her was her husband's best friend of 20 years. When she found out, it had a terrible effect on her. She was six months pregnant and her doctors were worried; she stopped going to work because she was paranoid about where the extremely realistic pornographic material was. She also shared that she was worried she could not protect her children. Ms. Kelly testified that although she can voluntarily decline to post information about her children online, "any child on any playground can be turned into a target in seconds."[4] She shared other concerns she has about the technology, including that it is overwhelmingly used on women and children and that it is so easy to use and victimize someone, noting, "[a] 12-year-old can snap a photo of a classmate and create a deep fake pornographic image in the time it takes to walk between classes."[5] She testified she is worried for her family: "I am raising my sons in a world where I fear their likeness, fear their likeness is gonna be used in unspeakable abuse before they can read."[6]

The second victim who testified was Jessica Guistolise.[7] She testified,

[i]n June 2024, I was made aware that a former roommate of my now husband and I and someone I considered a close friend, someone I trusted for over 20 years used a family photo from my private Facebook account to

---

[3] 2/19/26 Hr'g at 1:33:44-1:37:59.

[4] *Id.* 1:35:09-1:35:13.

[5] *Id.*, 1:36:10-1:36:17.

[6] *Id.*, 1:37:28-1:37:35.

[7] *Id.*, 1:38:37-1:41:41.

create multiple pornographic videos and images. Not just one, but multiple, and not just of me, but of over 80 other wom[e]n.[8]

The effect on her was real and hard to endure. She was afraid to leave her house for weeks and she testified that she still has trouble knowing who to trust. Ms. Guistolise testified, "[w]hen I go out with my husband for dinner, I look around and wonder, who knows that I am one of them?"[9] When she applies to jobs, she will have to disclose what happened because she does not know where the images are.

The third victim who testified was Megan Hurley.[10] She testified, "[p]ersonally speaking, it broke me open to be violated in this way. I missed two months of work, depleted my savings, and went into debt trying to recover and help identify and notify the other women who were pictured."[11] She testified that she has "never taken or exchanged nudes. However, because of this easily accessible technology, there are convincing graphic images and videos of me online for forever."[12]

Material provided to the February 19, 2026 House Commerce Finance and Policy Committee Hearing reveals that the three testifiers' experiences are unfortunately, not

---

[8]  *Id.*, 1:39:13-1:39:33.

[9]  *Id.*, 1:38:14-1:39:52.

[10]  *Id.*, 1:42:19-01:45:21.

[11]  *Id.*, 1:43:01-1:43:16.

[12]  *Id.*, 1:44:10-1:44:22.

4

unique.[13] RAINN, an anti-sexual violence organization that operates the National Sexual Assault Hotline,[14] provided information about nudification apps and websites:

- In 2023, ninety-six percent of manipulated images were non consensual and sexually explicit, featuring women. In one study, less than half of the "nudify" apps even ask whether consent has been obtained.

- In one month alone, over 24 million users used "Nudify" apps.

- In the first six months of 2024, sixteen "nudify" websites had 200 million visits

(2/19/26 Handouts, at 1.) The RAINN material also shared a comment from Mallory Jones, who described the harmful effect nudified images had on her:

> He took photos from my instagram and used AI to turn them into deepfake images. Then he posted them across multiple porn sites with my face and name. I had no idea this was going on for over 7 months. My face, name, and these fake photos/narratives gained hundreds of thousands of views each. Not only did I feel violated [and] disgusted, but I was worried for my future.

(*Id.* at 2.)

This technology does not harm only adults; it also harms children. "The Internet Watch Foundation (IWF) has identified a significant and growing threat where AI technology is being exploited to produce child sexual abuse material (CSAM)." (*Id.* at 14.) The concern is not isolated, as nudification can lead to other abuses. "Indeed, one

---

[13] H.F. 1606 Handouts, Minn. H., Hearing on H.F. 1606 before the H. Commerce Finance & Policy Comm., 94th Leg., Reg. Sess. (Feb. 19, 2026), *available at* https://www.house.mn.gov/comm/docs/ivjGPiheg0OTIVMoEyAF6A.pdf (last accessed Aug. 14, 2026) (hereinafter "2/19/26 Handouts"), https://perma.cc/572K-SZJK. The page for the meeting can be found at https://www.house.mn.gov/committees/minutes/94015/101693 (last accessed Aug. 14, 2026).

[14] https://rainn.org/

'paedophile guide' identified by IWF contained a section explicitly encouraging perpetrators to use 'nudifying' tools to generate material to blackmail children. The author of this guide claimed to have successfully blackmailed 13-year-old girls into sending intimate images." (*Id.* at 78.) Online, perpetrators express their affection for nudification technology: "Am seeing the video trailers that were generated by AI, and my mind is blown… The ability to create any child porn we desire… our wildest fantasies… in high definition." (*Id.* at 79.) Through June 2025, the National Center for Missing and Exploited Children received more than 440,000 reports flagging child pornography created with generative AI. (*Id.* at 96.)

Easy access to nudification technology harms students. The DOJ prosecuted a Minnesota school district employee who used his position of trust to take photos of children in his care and create sexual abuse images of children through AI. (*Id.* at 9.) At one school, 10th grade girls reported to administration that boys in their class had used AI software to fabricate sexually explicit images of them and were circulating the fake pictures. (*Id.* at 99.)

The problem is not isolated:

> Boys in several states have used widely available "nudification" apps to pervert real, identifiable photos of their clothed female classmates, shown attending events like school proms, into graphic, convincing-looking images of the girls with exposed A.I.-generated breasts and genitalia. In some cases, boys shared the faked images in the school lunchroom, on the school bus or through group chats on platforms like Snapchat and Instagram, according to school and police reports.

(*Id.* at 100.)

Additional material was submitted to the March 26, 2026 Judiciary Finance and Civil Law Hearing. The Senior Legislative Policy Counsel for RAINN submitted materials detailing how AI nudification technology has allowed harmful images to proliferate.

> [R]ecently a prominent social media site launched an AI tool that allowed users to edit images and post them to the platform with one click. A study examined the images created in the first 11 days after the tool was launched. They estimated that approximately 65% of the photos created were photorealistic sexualized images. That totals 3 million photorealistic sexualized images, a pace of 190 images per minute, in 11 days. Of those sexualized images, it is estimated 23,000 were of children.[15]

Any user who can upload a photo can victimize someone. "They advertise on mainstream social media platforms with slogans such as "Undress Any Girl You Want." Once the images are created, they can be posted anonymously, are rapidly and widely disseminated, and become nearly impossible to remove."[16] She also noted, "victims of tech enabled sexual abuse report significant feelings of helplessness, hopelessness, trauma, anxiety, and depression."[17]

The larger harm to the public is similarly evident in the lawsuits victims have brought. Five children brought a class action against X.AI alleging that their photographs were used to create child porn on Grok Imagine.[18] Two Arkansas families have sued X.AI

---

[15] H.F. 1606 Testimony, Minn. H., Hearing on H.F. 1606 before the H. Judiciary Finance and Civil Law Comm., 94th Leg., Reg. Sess. (Mar. 26, 2026), *available at* https://www.house.mn.gov/comm/docs/UloOvI_foU_cm3ZFNZJYQg.pdf, https://perma.cc/SW37-9WNH (last accessed Aug. 14, 2026) (hereinafter "3/26/26 Testimony").

[16] *Id.* at 4.

[17] *Id.*

[18] Amended Complaint, ECF 26, *Doe 1 v. X.AI Corp.*, No. 5:26-cv-02246 (N.D. Cal. filed July 7, 2026).

in Arkansas federal court alleging that Grok was used to generate child porn of their daughters, who are under 15 years old.[19] And a UK lawmaker who criticized X.AI owner, Elon Musk, sued the company because Grok users created fake images of her "being chlorophormed and prepared for sexual assault."[20] SpaceX has set aside over half a billion dollars for potential litigation losses for these and other claims because the risks of Grok Imagine's "Spicy" and "Unhinged" modes are well-known.[21] Access to these post-harm litigation tools is not available to everyone because "some images are spread to the darkest corners of the internet, where they are difficult for law enforcement to reach." (2/19/26 Handouts, at 98.) And, more than half of victims do not know the identity of their perpetrator. (3/26/26 Testimony, at 4.)

## II.   PASSAGE OF H.F. 1606

The House passed the anti-nudification bill on April 23, 2026. Minn. H.J., 94th Leg., Reg. Sess. 6139-40 (2026). Only one House member voted against it. The Senate passed the bill on April 29, 2026. Minn. Sen. J., 94th Leg., Reg. Sess. 9257-58 (2026). The Senate vote was unanimous. *Id.* It was signed into law by the Governor on

---

[19] *Doe v. X.AI*, Case No. 4:26-cv-00750-LPR (E.D. Ark. filed July 23, 2026); *Doe v. X.AI*, Case No. 4:26-cv-00772-DPM (E.D. Ark. filed July 29, 2026).

[20] Peter Walker, "Labour MP sues Elon Musk's xAI company over fake sexualised images," THE GUARDIAN, https://www.theguardian.com/technology/2026/jun/03/labour-mp-sues-elon-musks-ai-company-over-fake-sexualised-images (June 3, 2026).

[21] Maxwell Zeff & Paresh Dave, "SpaceX Listed Grok's 'Spicy' Mode as a Risk in Its IPO Filing," WIRED, https://www.wired.com/story/spacex-ipo-grok-spicy-mode-risks/, https://perma.cc/4DXQ-33WW (May 20, 2026).

May 7, 2026. Minn. Laws 2026, c. 72.[22] The Minnesota Nudification Ban went into effect on August 1. *See* Minn. Stat. § 645.02.

## III.    TEXT

The law defines "nudify' as the process by which "an image or video is altered or generated to depict an intimate part not depicted in an original unaltered image or video of an identifiable individual," and "the altered or generated image or video is so realistic that a reasonable person would believe that the intimate part belongs to the identifiable individual." Minn. Laws 2026, c. 72 § 1, subd. 1(d). Intimate part has the meaning given in Minnesota Statutes section 609.341, subd. 5. *Id.*, subd. 1(c).

## LEGAL STANDARD

A preliminary injunction "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In determining whether to grant a preliminary injunction, the Court must consider (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). The party requesting injunctive relief bears the "complete burden" of proving all of the factors listed above. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

---

[22] Available at https://www.revisor.mn.gov/laws/2026/0/Session+Law/Chapter/72/.

Moreover, because X.AI seeks to enjoin legislation, it bears the heavy burden of establishing likelihood of success on the merits, not just a fair chance of prevailing. This "more rigorous standard":

> [R]eflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly. If the party with the burden of proof makes a threshold showing that *it is likely to prevail on the merits, the district court should then proceed to weigh the other Dataphase factors*.

*Planned Parenthood of Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (emphasis added) (internal citation and quotation marks omitted). X.AI has not met its burden on this or any other factor.

## ARGUMENT

The Court should deny X.AI's motion for a preliminary injunction. X.AI's motion comes too late, and it has failed to demonstrate irreparable harm warranting a preliminary injunction. Moreover, the balance of the equities and the public interest favor denying a preliminary injunction. And X.AI has not shown a likelihood of success on the merits.

**I.   THE COURT SHOULD DENY THE MOTION FOR LACK OF DILIGENCE AND IRREPARABLE HARM.**

Irreparable harm occurs when the movant has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages. *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024). The moving party "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All–Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (internal quotation marks omitted). Bare allegations of what is likely to occur are

insufficient to establish irreparable injury. *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986). X.AI has not shown irreparable harm for several reasons.

First, X.AI's motion comes too late. X.AI is a sophisticated and well-resourced litigant yet chose to wait until just a few days before the Nudification Ban's effective date to bring this lawsuit. X.AI's lack of diligence and unreasonable delay confirms that a preliminary injunction is unnecessary.

"[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). "[D]elay in seeking relief vitiates much of the force of allegations of irreparable harm." *Hum. Rts. Def. Ctr. v. Sherburne Cnty.*, No. CV 20-1817 ADM/HB, 2020 WL 7027840, at *6 (D. Minn. Nov. 30, 2020) (citation and internal quotation marks omitted).

Here, the legislature passed Minnesota's Nudification Ban on May 4 and the Governor signed it on May 7. Minn. Laws 2026, c. 72. Yet X.AI did not file its suit nor seek injunctive relief for nearly three months. (*See* Compl.) X.AI has identified no irreparable injury sustained in the interim.

X.AI could have come to the Court promptly like other litigants who challenged legislation from Minnesota's most recent legislative session. Indeed, the Attorney General recently defended three lawsuits challenging the Minnesota legislature's prediction-market ban. That law was signed by the Governor on May 26, and it was scheduled to go into

11

effect on August 1—the same day as Minnesota's Nudification Ban. But the prediction-market ban was challenged immediately, and preliminary injunctions were fully briefed and argued to allow the Court to render a decision before August 1. *See United States v. Minnesota*, No. 26-CV-2661 (KMM/DTS), 2026 WL 2150211, at *1 (D. Minn. July 27, 2026).[23] X.AI, by contrast, waited until Minnesota's Nudification Ban was about to go into effect, manufacturing an unnecessary emergency for the Court and the parties in a complex case at the intersection of cutting-edge technology and First Amendment doctrine.

Second, at most, X.AI claims monetary harm, which is not irreparable. *Corning Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 562 F. Supp. 279, 283 (E.D. Ark. 1983) ("[M]onetary loss, even where substantial, does not, in and of itself, constitute irreparable harm."). The monetary harm appears to be minor because X.AI can adjust its tool to avoid the issue. (Compl. ¶ 15; ECF 14 ¶¶ 19-20.) X.AI also has provided no concrete evidence to substantiate or quantify this claimed harm.

Third, to the extent X.AI argues a violation of the First Amendment is irreparable on its own, X.AI is wrong. As an initial matter, and as discussed more fully below, X.AI does not have a First Amendment interest at stake—its users do. Further, the Eighth Circuit has been clear that even for First Amendment cases, a party must make a clear showing of likely irreparable harm to justify a preliminary injunction. *Kohls v. Ellison*, 166 F.4th 728, 732–33 (8th Cir. 2026); *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 894

---

[23] *See* Minn. Laws 2026, c. 118. The case numbers for the three prediction market cases are 26-cv-2661 (KMM/DTS); 26-cv-2778 (KMM/DTS); and 26-cv-2841 (KMM/DTS). The lawsuits were filed on May 19, May 27, and June 3, respectively.

(8th Cir. 2024); *see also Caballo Coal Co. v. Ind. Mich. Power Co.*, 305 F.3d 796, 800 (8th Cir. 2002) (a failure to demonstrate irreparable harm, "standing alone, may be a sufficient basis to deny preliminary injunctive relief.").

Eighth Circuit precedent underscores that a party cannot prevail on a motion for a preliminary injunction if they fail to show irreparable harm, even if they plead a First Amendment claim and establish likelihood of success on the merits. For example, in *Maixner v. Eidsness*, the Eighth Circuit reversed a preliminary injunction. 182 F.4th 736, 737 (8th Cir. 2026). The district court had concluded that the plaintiffs were likely to succeed on the merits of their claim. And because the case involved "'a First Amendment issue,'" the district court also concluded that "'the other factors of a preliminary injunction are presumed to be met.'" *Id.* at 738. The Eighth Circuit rejected that logic, holding that "a separate inquiry into irreparable harm is required." *Id.* Because the plaintiffs had not presented a sufficient factual record to support likely irreparable harm, the Court reversed on the irreparable harm prong alone; the Court expressed no view on the likelihood of success. *Id.* at 739.

Fourth, X.AI's threadbare allegations about speculative commercial injury, readily compensable with damages, pales in comparison to truly irreparable harm. *See, e.g.*, *U.H.A. v. Bondi*, 817 F. Supp. 3d 752, 768 (D. Minn. 2026) (describing stories of "trauma and terror" favoring immediate relief when detainees were being "hurriedly transported . . . to distant states, often without the ability to communicate with counsel, family, or the community"); *Frank V. v. Olson*, No. 26-CV-44 (JMB/DTS), 2026 WL 36120, at *1

(D. Minn. Jan. 6, 2026) (similar). The extraordinary equitable relief of a preliminary injunction is reserved for extraordinary and irreparable harm. X.AI's alleged injury is neither extraordinary nor irreparable.

X.AI has presented a thin record consisting of a single declaration that lacks specific and concrete detail about any purported harm and one exhibit—a policy—and has not shown it will suffer irreparable harm. Because X.AI has not met its burden to prove irreparable harm, the Court should deny its preliminary injunction motion. The Court need not consider any additional factors.

## II.   THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR THE ATTORNEY GENERAL.

The third and fourth factors—balance of harms and public interest—merge when the government is the non-movant. *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023). When applying the balance of harms factor, the key question is whether the movant's likely harm without a preliminary injunction exceeds the nonmovant's likely harm with a preliminary injunction. *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1347 (8th Cir. 2024). The purpose is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward. *Id.*

Here, the Attorney General has a sovereign interest in enforcing a near unanimous and democratically enacted civil statute. Entry of an injunction would severely harm the government and the public who depend on the Attorney General to protect their rights, especially here as the law X.AI seeks to enjoin protects some of the most vulnerable among

14

us from reprehensible victimization. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). The State's interest is especially strong where, as here, the plaintiff has not shown it is likely to succeed on the merits. *See Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 909 (8th Cir. 2020) ("[I]t is in the public interest to uphold the will of the people, as expressed by acts of the state legislature, when such acts appear harmonious with the Constitution."). Moreover, each day Minnesota's Nudification Ban is stayed, more nudified images will proliferate and be used to demean, objectify, and harass women and children. X.AI's monetary interests should not outweigh the privacy interests of the people of the State of Minnesota.

## III.   X.AI IS UNLIKELY TO SUCCEED ON THE MERITS.

A party seeking to preliminarily enjoin a state statute must demonstrate they are "likely to prevail on the merits." *Rounds*, 530 F.3d at 731–32. A plaintiff's failure to carry their burden on the likelihood-of-success factor is fatal to their case. *Id.* at 732; *Eggers v. Evnen*, 48 F.4th 561, 566 (8th Cir. 2022). And here, that burden is especially onerous because X.AI has brought this case as a pre-enforcement facial challenge, and facial challenges are "hard to win." *Moody*, 603 U.S. at 723. A facial First Amendment challenge can succeed only if a substantial number of the law's applications are unconstitutional when judged in relation to its plainly legitimate sweep. *Id.* at 723-24. A party's failure to

15

meet their facial challenge burden is a sufficient basis to deny a preliminary injunction. *Cf. GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 669–70 (8th Cir. 2024).

X.AI is not likely to succeed on the merits of its claims for two threshold reasons. First, it lacks standing to bring claims on behalf of its users because it has pleaded an interest *different* than its users. Second, X.AI itself has no First Amendment interest at stake. The Court can end its analysis there. But, if it proceeds further, X.AI is not likely to succeed on the merits of its claims fails because Minnesota's Nudification Ban survives under any level of scrutiny.

### A.  X.AI Lacks Standing to Bring Claims on Behalf of Its Users.

To the extent X.AI is seeking to bring claims on behalf of its users, it does not have third party standing. *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991) (test for third-party standing); *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (ordinarily, a plaintiff cannot bring claims to benefit third parties). To satisfy third-party standing, a party must show (1) the litigant suffered an injury-in-fact; (2) the litigant must have a close relationship to the third party; and (3) there must be some hindrance that prevents the third party's ability to protect his or her rights. *Powers*, 499 U.S. at 411. Even apart from the first prong, it is clear that X.AI cannot satisfy either the second or third prong. There is no indication third parties cannot bring claims on their own. And X.AI's interests are not aligned with that of its users because X.AI alleges that it already prohibits its users from engaging in the very conduct that the Nudification Ban proscribes—creating nudified images and videos. (Naser Decl. (ECF 14), at ¶ 9 (prohibiting users from "nudifying real persons").) And X.AI has sued its

16

own users over nudification and admits that third party users' use of its products exposes

it to risk, noting as a risk in SpaceX's IPO filing that:

> We may not have insight into, or control over, the practices of third parties who may utilize our AI technologies. As such, third parties have in the past used, and may in the future use, such AI technologies for improper purposes, including through the dissemination of illegal, inaccurate, defamatory or harmful content, intellectual property infringement or misappropriation, furthering bias or discrimination, cybersecurity attacks, including spear phishing and social engineering attacks, data privacy violations, other societal harms, including activities that threaten people's safety, financial security, or mental well-being on- or offline, or to develop competing technologies.[24]

XAI argues that it can assert claims on behalf of third party users because it is

asserting a facial overbreadth challenge to the Nudification Ban under the First

Amendment. The overbreadth doctrine does create an exception to the prudential

requirement for standing that a plaintiff assert its own legal rights and interests rather than

those of a third party. *Advantage Media, L.L.C. v. City of Eden Prairie*, 405 F. Supp. 2d

1037, 1042 (D. Minn. 2005). A party can invoke the overbreadth doctrine and assert the

legal rights of others if the party can reasonably be expected to properly frame the issues

and present them "with the necessary adversarial zeal." *Id.*; *Sec'y of Md. v. Joseph H.*

*Munson* Co., 467 U.S.947, 956 (1984). A plaintiff meets the adversarial zeal requirement

if (1) the plaintiff seeks to protect third party activities that are "at the heart of" its own

injury-in-fact and (2) the plaintiff's interests in challenging the statute are consistent with

---

[24] SpaceX IPO S-1 Filing at 29-31 46-47, available at https://www.sec.gov/Archives/edgar/data/1181412/000162828026036936/spaceexplorationtechnologi.htm; Recording Law Editorial Team, "xAI Sues Grok User Over Alleged AI-Generated Child Sexual Abuse Material," RECORDING LAW, https://www.recordinglaw.com/news/xai-grok-deepfake-user-lawsuit/ (July 16, 2026)

the First Amendment interests of the third party or parties it seeks to represent. *Advantage*, 405 F. Supp. 2d at 1042, *Munson*, 467 U.S. at 958.

Here, X.AI does not meet either requirement. X.AI's interests diverge from those of its users that seek to create nudified images. X.AI claims that it prohibits its users from making such images, and that it penalizes and bans users that use its tools for nudification. (Compl. ¶¶ 25-26.) Thus, X.AI's interests are actually opposed to those of the third party users whose conduct is implicated by the statute. X.AI, therefore, does not have standing to assert even First Amendment overbreadth claims on behalf of its third party users.

## B.    X.AI Does Not Have a First Amendment Interest at Stake.

A threshold requirement for any First Amendment free speech claim is the requirement that plaintiffs' activities involve protected speech or protected expressive conduct. *See Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985); *People for the Ethical Treatment of Animals v. Reynolds*, 173 F.4th 959, 966 (8th Cir. 2026) (noting that first step in First Amendment analysis is to determine whether the activity at issue is speech protected by the First Amendment); *Verlo v. Martinez*, 820 F.3d 1113, 1128 (10th Cir. 2016) ("to demonstrate a violation of their First Amendment rights, Plaintiffs must first establish that their activities are protected by the First Amendment"). If not, the Court goes no further in its analysis. *Cornelius*, 473 U.S. at 797.

Here, X.AI's creation of a platform that can be used to generate AI images is not speech or expressive conduct. And states enjoy latitude to regulate non-expressive conduct, even when the conduct is, in part, initiated, evidenced, or carried out by means of language. *Shamrock Hills, L.L.C. v. Iowa*, No. 25-2991, ___ F.4th___, 2026 WL 2330562, at *3

(8th Cir. Aug. 12, 2026); *Bishop v. Colaw*, 450 F.2d 1069, 1074 (8th Cir. 1971) (holding that conduct not intended to express an idea is not protected speech under the First Amendment).

The fact that a company's users may create speech does not give the company itself a First Amendment interest. The cases X.AI cites to support its attempt to circumvent this requirement all involve parties that were themselves engaged in speech. *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 577 (1983) (newspaper); *Buckley v. Valeo*, 424 U.S. 1, 20-21 (1976) (per curiam) (discussing impact on contributor's ability to engage in expression and on candidates' ability to speak); *Murdock v. Pennsylvania*, 319 U.S. 105, 113–14 (1943) (canvassers/solicitors). Here, in contrast, X.AI is not engaging in speech. Where the law in question does not impact X.AI's own speech or expressive conduct, X.AI does not have a First Amendment claim.

X.AI argues that it does not need to prove it engages in speech or expressive conduct when making a facial overbreadth challenge. As explained above, however, X.AI does not meet the requirements to assert a facial challenge on behalf of its third party users.

The Court should end its analysis here. X.AI has no First Amendment interest at stake. Nor does it have standing to assert a facial challenge on behalf of third-party users. X.AI has therefore not pleaded a First Amendment claim, and is therefore not likely to succeed on the merits.

19

C.    **Even If X.AI Had a First Amendment Claim, It Fails Under Any Level of Scrutiny.**

A facial claim is "the most difficult challenge to mount." *Phelps-Roper v. Ricketts*, 867 F.3d 883, 891-92 (8th Cir. 2017). To succeed, a challenger must establish that "no set of circumstances exists" under which the law would be valid, or that the law "lacks any plainly legitimate sweep." *Id.*; *accord United States v. Stevens*, 559 U.S. 460, 472 (2010). "Even in the First Amendment context, facial challenges are disfavored." *Moody*, 603 U.S. at 744. For an as-applied claim, a challenger must show that a law cannot constitutionally be applied to the challenger. *See, e.g.*, *People for Ethical Treatment of Animals, Inc. v. Reynolds*, 173 F.4th 959, 967-68 (8th Cir. 2026).

X.AI's as-applied claim is easily dispatched. Controlling precedent bars any contention that it would be unconstitutional to apply the Nudification Ban to child pornography, obscenity, or revenge porn generated by Grok Imagine. *See New York v. Ferber*, 458 U.S. 747, 757 (1982); *Miller v. California*, 413 U.S. 15, 23 (1972); *Minnesota v. Casillas*, 952 N.W.2d 629, 643 (Minn. 2020). Minnesota's law is plainly constitutional when Grok Imagine is used to generate any such content. Additionally, X.AI cannot prevail in an as-applied challenge because they do not allege that the challenged law has been unconstitutionally applied to them. *Phelps-Roper*, 867 F.3d at 896. The merits argument below thus focuses on X.AI's facial claim.

1.    **The Nudification Ban is content-neutral, so intermediate scrutiny applies.**

X.AI advances two theories for why strict scrutiny applies—first, because the statute restricts First Amendment speech, and second, because the statute is a content-based

20

restriction. (Compl. ¶ 49.) Both theories fail. As already argued, X.AI has no standing to assert any First Amendment claim and it has none of its own. As for its content theory, the Nudification Ban does not regulate content. Instead, the Nudification Ban regulates conduct—whether a technical tool can have a certain feature and whether technical tools with such features can be provided for access, download, or use by others. *See* 2026 Minn. Sess. Laws ch. 72, § 1 (prohibiting the "access, download, or use" of nudification tools).

X.AI resists this obvious reading by attempting to cast Grok Imagine—which it calls a "tool" and a "product"—as some sort of protected expression or content.[25] (Compl. 9 ¶ 20; Mem. 9, 11, 12; *see also* Naser Decl. ¶¶ 18 (describing Grok Imagine's nudification technology as an "image-editing feature" that can be deactivated selectively).)[26] Not so.

"[T]ools meant to facilitate the communication and content of others" are "not content in and of themselves." *Dryoff v. Ultimate Software Grp.*, 934 F.3d 1093, 1098 (9th Cir. 2019). Facilitating content generation by users is all that Grok Imagine does, as X.AI itself admits. (Compl. ¶ 21 (describing Grok Imagine's output as "images and videos that *users* create" (emphasis added)).) X.AI has not alleged or established any expressive attributes of Grok Imagine independent of prompts from third-party users. For the same

---

[25] X.AI does not appear to allege that the act of providing a tool like Grok Imagine is expressive conduct. *See Spence v. Washington*, 418 U.S. 405, 411 (1974) (applying First Amendment to "the expression of an idea through activity"). It is not. Indiscriminately providing Grok Imagine to the public lacks the sort of "communicative connotations" and context necessary to garner First Amendment protection. *Id.*

[26] X.AI's memorandum of law in support of its motion for temporary restraining order and preliminary injunction (ECF 13) is cited herein as "Mem." Page number citations are to X.AI's pagination. For example, "Mem. 12," is the page that says 12 at the bottom and is ECF page number 18 of 37.

reasons argued above that X.AI does not have any first-party speech interest at stake, the focal point of Grok Imagine at issue here is its functional capabilities, not the content it generates. As a result, the Nudification Ban only regulates conduct pertaining to a tool, and not content.

Several decisions from courts around the country support this conclusion by emphasizing the functional nature of technologies like Grok Imagine. *See, e.g.*, *Def. Distributed v. Att'y Gen. of N.J.*, 167 F.4th 65, 84–85 (3d Cir. 2026) (computer code for creation of 3D printed guns not expressive); *Green v. U.S. Dep't of Just.*, 111 F.4th 81, 96 (D.C. Cir. 2024) (Digital Millenium Copyright Act "expressly regulates conduct—the circumvention of technological locks, and trafficking in means of circumvention—rather than speech."); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001) (approving injunction against decryption code as content-neutral that targeted code's ability to instruct a computer to decrypt, a "functional capability [that] is not speech"); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d. 809, 852 (N.D. Calif.) ("[A] distinction exists between a "tool," or functionality, that permit[s] users to manipulate content and the content itself."); *Minnesota v. TikTok*, Order Denying Motion to Dismiss, Case No. 27-CV-25-15301, Index 148 (Henn. Cnty. Dist. Ct. Mar. 8, 2026) (lawsuit directed to TikTok's addictive features about conduct, not speech); *cf. also Garcia v. Character Techs., Inc.*, 785 F. Supp. 3d 1157, 1180 (M.D. Fla. 2025) (concluding AI chatbot application was a product susceptible to products liability action, notwithstanding its provision of "characters" who interact with users).

The Court's levels of scrutiny analysis can end here. Because Grok Imagine's nudification capability is a functional tool, the Nudification Ban implicates conduct, not content. So strict scrutiny does not apply. But even if the tool implicated content, though it does not, the Nudification Ban itself does not impermissibly target content and thus does not trigger strict scrutiny.

A regulation is "content based" if it targets speech "based on its communicative content." *City of Austin v. Reagan Nat'l Advertising of Austin, LLC*, 596 U.S. 61, 70 (2022) (quoting *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)) (internal quotation marks omitted). Courts look to the purpose of a law to determine whether it is content based. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("The government's purpose is the controlling consideration."); *SOB, Inc. v. County of Benton*, 317 F.3d 856, 862 (8th Cir. 2003) ("A ban on live nude dancing is content-neutral if its purpose is to combat harmful secondary effects, even though the ban 'has some minimal effect on the [underlying] erotic message.'"). Further, the First Amendment's prohibition against content discrimination "is not absolute" and "applies differently in the context of proscribable speech than in the area of fully protected speech." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992). When an entire class of speech lacks First Amendment protection, distinctions within that class pose no danger of idea or viewpoint discrimination. *Id.* at 388

Nudity is not "inherently expressive." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000); *accord Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 567-68 (1991). Nor is the

23

technology used by Grok Imagine to nudify images or videos itself expressive. *See Green*, 111 F.4th at 96 ("[T]rafficking [in means of circumventing technological protections of copyrighted work] is no more identified with expression than is the sale of lock picks for breaking into bookstores identified with the expressive conduct of reading the stores' books").

The Nudification Ban targets harmful weaponizations of nudity and the technology that makes those possible, not any ideas, beliefs, or expressions that might incidentally be joined with nudity in nudified images or videos. The statute does not, for example, single out for prohibition posts of nudified political actors while permitting posts of nudified pop stars. *See R.A.V.*, 505 U.S. at 388 (explaining that government could criminalize threats of violence directed against the president to the exclusion of other threats, but it cannot criminalize only those threats against the president that mention executive policy on aid to inner cities); *McCullen v. Coakley*, 573 U.S. 464, 479-80 (2014) (buffer-zone law not content based even though it only applied to abortion clinics); *Wacko's Too, Inc. v. City of Jacksonville*, 134 F.4th 1178, 1186 (11th Cir. 2025) (treating adult entertainment ordinance as content-neutral when its purpose was to combat the "secondary effects" of adult entertainment establishments, including sex trafficking). Instead, it targets images and videos that weaponize nudity, regardless of any incidental ideas or expressions.

X.AI is thus wrong to assert that the statute regulates content within the meaning of the First Amendment simply because it implicates the "content of the images that users create" with Grok Imagine's nudification technology. The other types of "content" that

X.AI points to, such as dramatic landscapes or softened lighting, are no more inherently expressive than nudity alone, and thereby illustrate how X.AI has approached the statute from too high a level of generality. *See City of Austin*, 596 U.S. at 72 ("Th[e] Court's First Amendment's precedents and doctrines have consistently recognized that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral."). The Nudification Ban does not target any speech "based on its communicative content" and is therefore content neutral. The appropriate test is not strict scrutiny.

### 2. The applicable standard is intermediate scrutiny and the statute survives.

Content-neutral laws are subject to intermediate scrutiny. *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 661-62 (1994); *TikTok, Inc. v. Garland*, 604 U.S. 56, 67 (2025). This standard is satisfied if the law "promotes a substantial government interest" that is less effectively achieved without the law, and if the law does not burden "substantially more speech than is necessary" to further the government interest. *Id.* at 76-77 (citing *Ward*, 491 U.S. at 799). Because the Nudification Ban is content neutral, Minnesota need not show that it is the least restrictive alternative. *Ward*, 491 U.S. at 797. And X.AI's challenge is facial, so the Court must "consider any limiting construction that a state court or enforcement agency has proffered." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982).

The Nudification Ban easily satisfies intermediate scrutiny. X.AI openly concedes that Minnesota's interest is compelling, acknowledging that the state "s[ought] to guard its citizens against real harm" and to "advance a legitimate interest in prohibiting the

25

dissemination of artificially generated nude images of real people without their consent." (Mem. 1; *see also id.* 14.) The only issues, then, are whether the Nudification Ban's aims would be achieved less effectively in its absence (they would), and whether the statute avoids burdening substantially more speech than necessary to further this interest (it does).

### a. Minnesota cannot prevent digital sexual victimization without the Nudification Ban as effectively as it could with the Nudification Ban.

Minnesota's ability to further its interest in preventing artificially nudified images would be served less effectively without the Nudification Ban. As X.AI admits, Grok Imagine, has been designed "so that anyone can use it." (Compl. ¶ 23.) It requires no money, no skill, no specialized software, and not even physical presence in the United States—just a device with access to the internet. (*Id.* ¶¶ 23-24.) When Grok Imagine receives a prompt to nudify someone's image, "the result arrives in seconds." (*Id.* ¶ 23.) All it takes to nudify someone—to violate and victimize them—are a few strokes of the keyboard and mere seconds of processing time.

With Grok Imagine, X.AI has created an unparalleled marketplace for digital sexual violence that poses virtually no barrier to entry. That marketplace, coupled with the functional capabilities of Grok Imagine, would doom Minnesota from the start if it could not direct its laws to the technology that makes digital sexual victimization possible in the first place. *See Green*, 111 F.4th at 99 (reasoning that government's ability to protect digital works required a technological solution). Minnesota's need for a technology-based solution is heightened considering the staggering volume of illegal content that Grok Imagine is technologically capable of generating. (Compl. ¶ 26.) Something is wrong if

X.AI itself admits that it needed to make over 70,000 reports to the National Center for Missing and Exploited Children in 2026 alone. (*Id.*)

X.AI posits that other, purportedly less-restrictive federal and state laws already address the harmful conduct that the Nudification Ban seeks to curb and thereby show that this law is not necessary. (Mem. 19-21). But X.AI's own statistics about the flood of illegal conduct that proliferate from Grok Imagine while these laws have been on the books prove the opposite. The technology that feeds this "explosion of image-based" sexual violence is part of the problem, (Compl. ¶ 23), and Minnesota's attempt to curb that explosion is less effective without regulations directed to that technology as part of its solution. *Cf. Ward*, 491 U.S. at 800 (requiring courts to defer to government's "reasonable determinations" about how its interests would be best served). There are many reasons the other methods are not as effective; for the other laws to be sufficient, someone must *see* the offending image and work with a platform that has a process in place for removal; regarding criminal penalties, the offending user must be a human who is identifiable and subject to the state's jurisdiction. Some images are hard to find, (2/19/26 Handouts, at 98), and, more than half of victims do not know the identity of their perpetrator, (3/26/26 Testimony, at 4).

**b.      The Nudification Ban does not burden substantially more speech than is necessary.**

The statute only incidentally burdens speech to the extent that is necessary to further Minnesota's compelling interests. X.AI attempts to paint a rosy picture of Grok Imagine, but this effort is a red herring. (*See, e.g.*, Compl. ¶ 21 (coloring pages and restored family

photographs).) It is undisputed that the Nudification Ban does not reach these quotidian use cases.

This threshold issue aside, X.AI admits the staggering quantity of CSAM and other unlawful material that Grok Imagine proliferates but it does not even plead any comparable statistics about the amount of allegedly protected speech that Grok Imagine generates. (*Compare* Compl. ¶ 26 (50,000 suspended accounts, 70,000 reports to National Center for Missing and Exploited Children, and 244 arrests—all in 2026 alone) *with* ¶¶ 14 ("many" constitutionally protected images and videos), 35 ("wide range" of pedestrian images).) True, X.AI offers images of politicians in the reflecting pool and a boxing ring as examples of what it portrays as innocuous content unfairly barred by the Nudification Ban. X.AI is wrong about the statute's application to those images, but even if it were not, those "highly particularized yet underdeveloped examples simply do not add up to the 'lopsided ratio' of unconstitutional applications required to sustain a facial challenge." *Green*, 111 F.4th at 100 (citation omitted); *see also NetChoice, LLC v. Bonta*, 170 F.4th 744, 760 (9th Cir. 2026) (instructing that facial challengers bear the burden of developing a full record on a law's "full set of applications" (citing *Moody*, 603 U.S. at 718)).

The Nudification Ban's focus on AI-powered nudification technology itself, rather than any type of content or expression, is prima facie evidence of its narrow tailoring. Unlike technology that generally creates nudity, the technology that this statute prohibits nudifies "identifiable individual[s]" to so realistic a degree that a "reasonable person would believe the [depicted] intimate part[s] belong[]" to those individuals, and it does this so

28

automatically that a human's technical, artistic, and expressive contributions are irrelevant. 2026 Minn. Sess. Laws ch. 72 §§ 1, subd. 1(d), 3. This technology is too closely and inextricably linked with unlawful uses related to CSAM, obscenity, and other forms of digital sexual victimization to be fairly construed as a tool with substantial or even any legitimate applications. *See Green*, 111 F.4th at 103 ("[T]he act of circumventing technological protection measures often has no connection to speech at all."); *cf. United States v. Price*, 111 F.4th 392, 408 (4th Cir. 2024) (upholding prohibition on firearms without serial numbers when court could not fathom "any common-sense reason for a law-abiding citizen to want to use a firearm with an obliterated serial number for self-defense"); *Weiler v. Carpenter*, 695 F.2d 1348, 1350 (10th Cir. 1982) (no First Amendment infringement from prohibition on advertising objects "designed or intended for use as drug paraphernalia"); *Casbah, Inc. v. Thone*, 651 F.2d 551, 564 (8th Cir. 1981) (upholding prohibition on drug paraphernalia advertising even though it reached advertisements that only "in part" have the purpose of promoting paraphernalia sales).

The Nudification Ban also limits its prohibition to depictions of covered intimate parts that result from the automated nudification of identifiable individuals. Thus, someone who goes topless in public and is photographed with exposed breasts may be the subject of a photograph without triggering the Nudification Ban. Only when a photograph of someone who chose to cover their breasts in public is nudified via Grok Imagine will the Nudification Ban take effect.

29

### c. X.AI's arguments about overinclusivity are unavailing.

X.AI makes five arguments about overinclusivity, none of which have merit.[27] First, it asserts that the statute encompasses "images and videos that do not arguably contain any nudity." (Compl. ¶ 60; Mem. 15-16.) But X.AI misunderstands the purpose of the Nudification Ban, which is not about avoiding nudity but preventing digital victimization through the depiction of an individual's intimate part(s) that they did not themselves choose to present to the world in a particular image. There are different dignitary interests at stake when a competitive swimmer presents themselves to the world in a speedo than when an identifiable individual is photographed in full clothing but nevertheless is depicted, by virtue of nudification technology, wearing a speedo. The Nudification Ban only reaches the latter.[28]

Second, X.AI contends that the statute is overinclusive in its failure to provide exceptions for "altered images and videos with political, scientific, educational,

---

[27] The fifth argument addressed the nature of the state's interest in preventing nudification, not any alleged overinclusivity. X.AI asserts that a different state interest is implicated when nudified images are created versus when nudified images are created and disseminated. (Mem. 19.) But nudified images are disseminated when they are created by Grok Imagine—to the prompting user. Dignitary injury and privacy invasion occurs not just when someone learns that a nude image or video of themselves has been viewed by another but at the moment of nudification by Grok Imagine and similar tools.

[28] Further, the statute's definition of "intimate part" incorporates by reference another state law. Any interpretation of "intimate part" or "nudity" under the Nudification Ban is thus a question of Minnesota law that must be resolved by looking to narrowing constructions that the Minnesota Supreme Court has or conceivably might provide. *See Shamrock Hills, L.L.C. v. Iowa*, No. 25-2991, ___ F.4th___, 2026 WL 2330562, at *6 (8th Cir. Aug. 12, 2026) ("we must take the statute as though it read precisely as the highest court of the state has interpreted it") (quotation omitted). Absent clear state law guidance, this Court should certify that question to the Minnesota Supreme Court. *See Mckesson v. Doe*, 592 U.S. 1, 5–6 (2020) (per curiam).

journalistic, artistic, medical, or religious value." (Mem. 16.) But the Nudification Ban does not prohibit content with the expressive values that X.AI identifies; the public may still create such content. Instead, the Nudification Ban prohibits only using specific technology (AI-based nudification technology) to create the content, as the evils of that technology go to the heart of Minnesota's compelling interest. Nor does the Nudification Ban prohibit expressive conduct, preserving the ability of a "human creator" to engage in a "substantial application of individualized technological or artistic skill and judgment" by, for example, photoshopping an image. Minn. Sess. Laws ch. 72 §§ 1, subds. 1(e), 3.

Take X.AI's example of turning a male politician into a satirical, shirtless strongman. (Mem. 16.) That sort of content is perfectly acceptable so long as it is generated without the use of automatic tools that are regularly used to create harmful and unprotected content. Minn. Laws ch. 72, §§ 1, subds. 1(e), 3. For example, the desired strongman satire instead could be created by using an application like Photoshop which could more easily be identified as fake. The Nudification Ban's distinction between acceptable and unacceptable conduct is thus a reasonable attempt to stamp out digital sexual victimization by targeting the technology that engenders unlawful and unprotected output at unprecedented rates, while leaving intact other, less harmful means of engaging in protected expression.

Indeed, the ban fully exempts parody and satire because it defines nudification by requiring that "the altered or generated image or video is so realistic that a reasonable person would believe that the intimate part belongs to the identifiable individual."

31

2026 Minn. Sess. Laws ch. 72, § 1, subd. 1(d)(2). That definition necessarily excludes parody and satire because parody is that which "cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (quoting *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50 (1988)) (alteration original); *see also Kohls v. Ellison*, No. 24-CV-3754 (LMP/DLM), 2025 WL 66765, at *4 (D. Minn. Jan. 10, 2025), *aff'd*, 166 F.4th 728 (8th Cir. 2026).

Third, X.AI argues that consensually nudified images are unduly proscribed. Like its misapprehension about the statute's treatment of nudity in general, this argument assumes that the Nudification Ban bars something it does not. An adult who wants a photo of herself without clothing may easily take a nude photo, just as an adult who seeks a nude photo of an adult intimate partner may simply take or request a nude photo of their partner, with consent. The end result is the same—a nude photo of a consenting subject. All that the Nudification Ban proscribes is the use of harmful technology to achieve that result.

*Green v. United States Department of Justice* provides a helpful analogy. The plaintiffs in that case posited that the Digital Millenium Copyright Act was overbroad because it would bar a fifth-grade teacher from using decryption technology to extract a DVD's content for screening during a lesson and thereby burden classroom speech. *See Green*, 111 F.4th at 99. The court rejected the hypothetical, noting that the teacher could engage in the same speech by using alternative technology with fewer unlawful applications, like a DVD player with a fast-forward function. *Id*. The Nudification Ban likewise avoids burdening any protected consensual speech, requiring only that such

32

speech be created without an instrumentality that proliferates explosive amounts of CSAM and other illegal conduct.

Fourth and finally, X.AI argues that the Nudification Ban unfairly imposes a "strict-liability regime with no scienter requirement," thereby chilling "AI providers whose terms of service prohibit nudification and who enforce those terms." (Mem. 18.) Under the forgiving framework of intermediate scrutiny, this assertion flounders considering X.AI's own admissions about the vast quantity of illegal conduct on its platform and the attributes of Grok Imagine that makes it so easy for this illegal conduct to proliferate at an unprecedented scale. (Compl. ¶¶ 23-24, 26.) Clearly, X.AI knows how to identify and quantify illegal uses of Grok Imagine, yet it has failed to stop the flood of digital sexual victimization that its technology makes possible. X.AI cannot play the proverbial ostrich and demur responsibility for the natural and probable consequences of the technology it created. For these reasons, the Nudification Ban passes intermediate scrutiny.

### 3. Even if strict scrutiny applied, the statute would survive.

X.AI focuses its argument on the application of strict scrutiny, which is irrelevant because the Nudification Ban is content-neutral. But even if strict scrutiny applied, the Nudification Ban would survive because it is narrowly tailored to serve a compelling interest. Strict scrutiny is "demanding." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015). While it is "the rare case" in which a law subject to strict scrutiny clears that standard's hurdle, "those cases do arise." *Id.* ("[W]e wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact.'" (citation omitted)). X.AI does not seriously

33

dispute that Minnesota's interest is compelling, so as with the intermediate scrutiny analysis, the focus is narrow tailoring.

To determine whether a statute is narrowly tailored, courts ask if the statute is the "least restrictive means of achieving the government's compelling interest." *Sanderson v. Hanaway*, 163 F.4th 1101, 1107 (8th Cir. 2026) (citing *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000)). Alternative forms of regulation qualify as less restrictive alternatives, for purposes of strict scrutiny, if such regulation are "at least as effective in achieving the legitimate purpose that [a] statute was enacted to serve." *Playboy*, 529 U.S. at 813. Laws that are overinclusive or underinclusive may fail under strict scrutiny. *See Miller v. Ziegler*, 109 F.4th 1045, 1052 (8th Cir. 2024). And again, because X.AI's challenge is facial, the Court must "consider any limiting construction that a state court or enforcement agency has proffered." *Hoffman Ests.*, 455 U.S. at 494 n.5.

In the intermediate scrutiny analysis above, the Attorney General detailed why Minnesota's efforts to stamp out digital sexual victimization would be less effective and why the Nudification Ban is well-tailored and not overinclusive. X.AI does not argue that the statute is underinclusive (it is not). Thus, the primary issue for strict scrutiny is whether the Nudification Ban is the least restrictive alternative to advance Minnesota's compelling interest. It is.

The Nudification Ban is the least restrictive alternative because its prohibition is tightly coextensive with its aim, banning the application of nudification technology for the digital sexual victimization of identifiable individuals to prevent that exact harm. *Cf.*

*Animal Legal Def. Fund v. Reynolds*, 8 F.4th 781, 785-86 (8th Cir. 2021) (upholding provision of law that criminalized access to agricultural facilities by fraud as the law exclusively prohibited lies "associated with a legally cognizable harm"). The legislative record reflects that the vast majority of AI-generated nudified images are not consensual, so the privacy and dignitary harm occur when the nudified image is created; the ban targets the technology that allows the image to be created.

Further, the statute is narrowly tailored because it does not target image-alteration technology wholesale; ban all nude images and videos; or ban all modified images and videos, nudified or not. Instead, it trains its focus on the harmful technology that makes unlawful nudification possible, and by extension, digital sexual victimization—a feature of Grok Imagine that X.AI admits it can selectively disable. (Naser Decl. ¶¶ 19-22.) This approach ensures that the statute's reach is directed at the problem it aims to solve and nothing more.

This sort of "targeted blocking" is "less restrictive than banning." *Playboy*, 529 U.S. at 815. The Nudification Ban thus differs from content-based restrictions that the Supreme Court has invalidated under strict scrutiny as overinclusive. *See, e.g.*, *id.* at 806-07 (law that required cable television operators providing channels "primarily dedicated to sexually-oriented programming" to fully block their channels or limit transmission to certain hours); *Sable Comms. of Calif., Inc. v. FCC*, 492 U.S. 115, 122-23 (1989) (law that imposed a "total ban" on dial-a-porn, applicable to children and adults alike). Because it is a narrow, targeted block of technology that X.AI admits can be selectively disabled, the Nudification

35

Ban is the least restrictive means of curbing the unlawful and harmful conduct that this technology makes possible.

X.AI proposes several allegedly less restrictive alternatives, but each would be less effective in serving Minnesota's compelling interest. When presenting each of its putative alternatives, X.AI refers to existing state or federal laws, including Minnesota's deep-fake statute and the federal TAKE IT DOWN Act. (Mem. 20-22.) Plainly, however, these laws have not staunched the tide of harmful and illegal conduct that X.AI admits runs rampant on its platform. Attempting to address this conduct by focusing on dissemination is like trying to stop a room from flooding by setting out buckets rather than simply staunching the leak at its source.

The Supreme Court endorsed this reasoning in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, a case about companies that distributed free peer-to-peer file sharing software that ended up being used for copyright infringement: "When a widely shared service or product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor of the copying device for secondary liability . . . ." 545 U.S. 913, 929-30 (2005) ("The argument for imposing indirect liability" is "a powerful one, given the number of infringing downloads that occur every day using StreamCast's and Grokster's software."). *Grokster* is addressed to copyright infringement, but its reasoning about the practicalities of curbing illegal conduct that has been unleashed by technology easily transfers to this case. Different mediums may present "special First

36

Amendment problems," and that principle applies to the nudification technology at issue here. *FCC v. Pacifica Found.*, 438 U.S. 726, 748 (upholding broadcast regulation given broadcast media's status as "uniquely pervasive"); *see Sable*, 492 U.S. at 127-28 (distinguishing *Pacifica* on this basis).

What X.AI's proposed alternatives to the Nudification Ban have in common is that they only address the ills of nudification after it occurs—they are downstream fixes rather than upstream solutions. But dignitary harm occurs at the moment of nudification, rather than coming into being as subsequent disseminations take place. The Nudification Ban seeks to stop this problem in its tracks. The technology at issue here uniquely enables digital sexual victimization, so the Nudification Ban is fairly targeted to the technology itself and not its aftermath. None of X.AI's proposed alternatives achieve this same result because none of them target the technology that makes CSAM and other forms of digital sexual victimization possible. The Nudification Ban does, and it does so in the manner that is least restrictive as possible on any ancillary protected expression.

In sum, the Nudification Ban serves a compelling state interest and is the least restrictive means possible of achieving that interest. Therefore, it passes strict scrutiny.

> **D.  X.AI's Overbreadth Challenge Fails Because the Company Has Not Shown that the Nudification Ban's Constitutional Applications Substantially Outweigh Its Unconstitutional Applications. There Are Several Constitutional Applications.**

For related reasons, X.AI is unlikely to meet its facial-challenge burden because, as X.AI effectively concedes, Minnesota's law has several constitutional applications. For example, AI-generated pornographic images of children are entitled to no

37

First Amendment protection, *New York v. Ferber*, 458 U.S. 747, 757 (1982), so Minnesota's law is plainly constitutional if Grok Imagine is used to generate those images. Similarly, obscene material is entitled to no First Amendment protection, *Miller v. California*, 413 U.S. 15, 23 (1972), so Minnesota's law is plainly constitutional if Grok Imagine is used to generate those images. And if Grok Imagine generates non-consensual sexual images, commonly known as "revenge porn," then those images are constitutionally unprotected too. *See, e.g.*, *Minnesota v. Casillas*, 952 N.W.2d 629, 643 (Minn. 2020).

While X.AI alleges that Grok Imagine has sympathetic use cases, like coloring pages and cozy candle advertisements, it makes no allegation—and offers no evidence—about the prevalence of such use cases relative to the prevalence of dangerous use cases entitled to no constitutional protection. (Compl. ¶¶ 21–22.) And many of these use cases do not even implicate the Nudification Ban.

Since the Supreme Court decided *Moody* and emphasized the onerous facial-challenge burden—even in First Amendment cases—the federal courts of appeal have repeatedly concluded that plaintiffs have failed to meet their burden at the preliminary injunction stage. *See, e.g.*, *Shamrock Hills, L.L.C. v. Iowa*, No. 25-2991, ___ F.4th___, 2026 WL 2330562, at *4 (8th Cir. Aug. 12, 2026); *Iowa Safe Schools v. Reynolds*, 172 F.4th 589, 595 (8th Cir. 2026); *Terry v. Drummond*, __ F.4th __, 2026 WL 2164884, at *9 (10th Cir. July 28, 2026) (emphasizing that plaintiffs must show that a law's unconstitutional applications are "*substantially* disproportionate to the statute's lawful sweep" (quotation omitted)); *Smiley v. Jenner*, 173 F.4th 865, 870-71 (7th Cir. 2026)

(similar). So too here. X.AI concedes that many of the Nudification Ban's applications are constitutional. And even if there are unconstitutional applications, the evidentiary record is too thin to show that they "substantially outweigh[]" the constitutional applications. *Reynolds*, 172 F.4th at 595. Therefore, X.AI had not met its burden under *Moody*.

## CONCLUSION

The Attorney General requests that the Court deny X.AI's motion for a preliminary injunction.

Dated: August 14, 2026

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

s/ **Janine Kimble**
PETER J. FARRELL (#0393071)
Acting Solicitor General
JANINE KIMBLE (#0392032)
MARGARET JACOT (#0346755)
MADELEINE DEMEULES (#0402648)
Assistant Attorneys General

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 757-1415 (Voice)
(651) 282-5832 (Fax)
janine.kimble@ag.state.mn.us

*Attorneys for Defendant*

|#6433159-v1